Thomas OLSON, Appellant,

v.

**CITY OF HOOPER BAY, Officer Dimitri Oaks, Officer Charles Simon, and Officer Nathan Joseph, Appellees.**

No. S–13455.

Supreme Court of Alaska.

April 15, 2011.

---

Michele L. Power, Power & Brown, LLC, Bethel, for Appellant.

William H. Ingaldson and Maryanne Boreen, Ingaldson, Maassen & Fitzgerald, P.C., Anchorage, and Myron Angstman, Angstman Law Office, Bethel, for Appellees.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Hooper Bay police responded to a request for a welfare check at the home of Thomas Olson, Suzanne Smith, and their young children. The officers found Olson asleep. When they woke him, Olson became belligerent and the officers placed him in handcuffs to escort him out of the building. In the process, Olson and two of the officers slipped and fell to the floor. The situation escalated when the officers tried to get Olson onto his feet and remove him from the home. In the ensuing scuffle, the officers used their tasers on Olson numerous times. Olson filed a civil suit alleging excessive force, assault, and battery. The superior court granted summary judgment in favor of the defendants on the grounds of qualified immunity, and Olson appeals. We affirm the superior court's conclusion that existing case law and regulations did not provide notice to the officers that their use of tasers may have been excessive force. But because it was error for the court not to consider whether the Hooper Bay Police Department's policy on taser use or the nature of the officers' actions, alone, provided notice that the force they used may have been excessive, we reverse the grant of summary judgment and remand for further consideration.

## II. FACTS AND PROCEEDINGS

### A. Facts

Thomas Olson and Suzanne Smith live in Hooper Bay and have six children together. On Christmas night in 2006, Smith left Olson with the youngest four of their children, ranging in age from one month to five years, and went to visit her mother. Olson admitted drinking "a couple [of] cups of home-brew" that evening with his brother Peter. At 3:55 a.m. on December 26, Smith called the City of Hooper Bay Police and asked them to conduct a welfare check on the children because she was concerned that Olson was intoxicated and alone with them.[1] Officers Dimitri Oaks and Nathan Joseph responded to the request and arrived at the Olson home approximately 10 minutes later.

The front door leading to the home's arctic entry was open despite an outside temperature of approximately five degrees Fahrenheit. The officers entered the living area, a large space with no internal dividing walls, and found Olson and his brother Peter. Both men appeared to be asleep and the

---

1. The welfare check took place pursuant to AS 11.51.110(a)(2), which provides: "A person commits the offense of endangering the welfare of a child in the second degree if the person, while caring for a child under 10 years of age, ... is impaired by an intoxicant ... and there is no third person who is at least 12 years of age and not impaired by an intoxicant present to care for the child."

officers noticed an odor of alcohol in the room. Olson admits to drinking that evening, but states that he "limited [his] drinking." No objective tests were performed to determine whether Olson was intoxicated. To simplify our discussion of the subsequent events, we analyze the sequence in four phases.

### 1. Phase One: Verbal interaction between Olson and the officers.

The officers woke Olson, and Joseph informed him that they were there to conduct a welfare check.[2] They asked Olson to stand up for a "real quick test," and Olson responded by asking why the officers were trespassing in his house. Joseph continued to ask Olson to stand up, apparently without a positive response, and the officers placed Olson in handcuffs. Joseph explained to Olson that he was putting on the handcuffs "for safety reasons" and that "once we're done here we'll take the handcuffs off." Hooper Bay Police Department and the individual police officers assert that Joseph and Oaks were concerned about safety because they were familiar with Olson's "combative" history with the police.[3] Olson affied that he knew that the officers had a bad reputation for violent and unnecessary behavior.

Olson stood up after he was handcuffed and began to yell and swear at Joseph and Oaks about their presence in his house. When Peter woke up, the officers placed him in handcuffs and told him that the handcuffs would be removed when they were done. Olson and Peter continued to express their shared opinion that the officers were trespassing, becoming increasingly vocal and angry. Joseph radioed headquarters to ask that another officer come to the scene.

After a brief period of relative calm, Olson resumed yelling and swearing and stated, "You can get shot for trespassing." Joseph asked, "Is that a threat? Are you threatening me?" Olson responded, "No, I'm telling you." Throughout Olson's interaction with the officers, Peter called out support and encouragement to his brother. About three to five minutes after Joseph radioed for assistance, Officer Simon entered the house.

### 2. Phase Two: The initial use of the taser.

Simon and Oaks began to escort Olson out of the home, but in the process of doing so, the three men fell to the floor.[4] Olson affied that he did not struggle with the officers, that he did not know what was going on, and that he tried to get his feet underneath him and stand up again. But Joseph testified that after Oaks and Simon stood up, Olson began "kicking at" both officers. Oaks and Simon testified that Olson also attempted to bite Simon, a fact which Olson does not dispute. The arrest audio recorded the sounds of a scuffle, Joseph saying, "Get him out of here," and Olson continuing to scream and swear. Olson's hands remained handcuffed behind him throughout the interaction.

At some point while on the floor, Olson wrapped his legs around a vertical support pole in the living area; the arrest audio recorded one of the officers telling Olson to "stand up" several times, and Simon stating, "Boya, if you don't comply I am going to drive stun you; let go of the pole." In response, Joseph, who was standing apart from the group, deployed his taser two times from across the room. The taser prongs did not make a complete circuit and Olson responded by saying, "It feels like a vibrator." The officers continued to tell Olson to stand up, stop resisting, and comply with their

---

2. Olson testified by affidavit that "a flashlight in [his] face" woke him, but Joseph testified that he shook Olson and called his name to wake him. The arrest audio recorded Joseph quietly calling Olson by his nickname, "Boya," and apparently tapping or shaking him.

3. Both Joseph and Oaks had previously arrested Olson; Joseph in 1998 for furnishing alcohol to minors, and Oaks in 2006 for disorderly conduct. Joseph testified that he knew Olson to be "as-

saultive, uncooperative and combative with police officers."

4. Olson affied that the fall occurred when Oaks slipped on a trash bag and pulled the group down. There is some question in the officers' testimony about whether the group got back up and then fell for a second time. For the sake of our analysis, it is relevant only that the group was on the floor at the time that the officers' conflict with Olson escalated.

efforts to remove him from the home. Olson responded with a string of protests and profanity. The officers then began to deploy their tasers in drive-stun mode.[5]

### 3. Phase Three: The officers repeatedly tase Olson.

The officers tased Olson numerous times in rapid succession. The arrest audio recorded use of the tasers in drive-stun mode repeatedly over the course of approximately 50 seconds. Olson affied that Simon began tasing him on his back, then reached around to tase him between his legs. Simon testified that he first tried two two-second stuns on Olson's back, followed by three two-second deployments on Olson's collarbone, and then two two-second deployments on Olson's inner-thigh.[6] Joseph testified to deploying his taser in drive-stun mode approximately five or six times. Oaks was not armed with a taser and did not deploy one during the incident. Olson affied that, out of fear, he wrapped his legs around the support pole after the tasing began, and that his leg muscles "reacted" each time he was tased. His hands remained handcuffed behind him. The officers stated that Olson's actions appeared to be further attempts to kick them and to resist arrest.

### 4. Phase Four: The officers tase Olson while he is on his stomach.

The officers eventually rolled Olson onto his stomach and used their tasers in drive-stun mode at least twice as he lay in that position. They then repeated their request that Olson "stand up." Olson eventually complied and was escorted by the officers to police headquarters.

On January 26, 2007, Olson was examined by a physician at Yukon–Kuskokwim Health Corporation. The medical record from the examination appears to identify approximately 25 taser burns,[7] but the superior court relied on estimates presented by Olson and Olson's expert witness, and found that "[v]iewing facts in the light most favorable to [Olson], [Olson] was [t]ased fifteen to eighteen times."

### B. Proceedings

Olson filed suit against the City of Hooper Bay and officers Oaks, Simon, and Joseph (collectively, "Hooper Bay") alleging excessive force, assault, and battery. He requested compensatory and punitive damages.[8] Hooper Bay denied the allegations and asserted affirmative defenses including qualified immunity. Hooper Bay then filed a motion for summary judgment on qualified immunity.[9] The superior court heard argument on the motion, entered a written order granting it, and dismissed the case. The court found the initial taser deployments "objectively reasonable" because the officers "were faced with an immediate threat of bodily harm from [Olson] kicking and biting them in a rapidly deteriorating situation in the home." The court wrote that "[t]he use of the taser to subdue a suspect who repeatedly ignores police instructions and acts belligerently towards police is not excessive force." But the court also concluded that a genuine issue of material fact existed as to the objective reasonableness of the subsequent taser deployments. Thus, consistent with our case law on qualified immunity, the court considered whether the officers "might have reasonably believed their actions were

---

5. As explained in the deposition of the appellant's expert witness, Dr. Michael D. Lyman, there are two ways to deploy a taser: (1) by shooting a cartridge that attaches the prongs of the taser to the subject's clothing via a wire, and (2) by placing the weapon itself in contact with the subject. The latter method is known as "drive-stun" mode.

6. Olson's expert conceded that tasing on the inner thighs is a recommended practice for disabling a subject.

7. The medical report includes a body diagram with small circles representing the location of the taser burns on Olson's torso and legs.

8. Olson was charged with five counts of reckless endangerment, three counts of assault of a police officer, and resisting arrest. The criminal charges were later dismissed.

9. Oaks separately moved for summary judgment on the grounds that he did not deploy a taser as alleged in the complaint. The court granted his motion.

reasonable."[10] The superior court concluded that "the contours of Fourth Amendment jurisprudence on the claims of excessive force involving [t]asers was not sufficiently clear such that a reasonable law enforcement officer in the officers' position under these circumstances would have known that the multiple tasings of [Olson] violated his Fourth Amendment right to be free of excessive use of force." Final judgment was entered in favor of City of Hooper Bay, Oaks, Simon, and Joseph on September 9, 2008, and re-entered in conjunction with an award of attorney's fees on March 8, 2009.

Olson appeals the order granting summary judgment.[11]

## III. STANDARD OF REVIEW

■ We review a grant of summary judgment "de novo, affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law."[12] We "view the facts in the light most favorable to the non-moving party"[13] and thus draw "all reasonable ... in-

ferences" in Olson's favor.[14] Because this case raises the question of entitlement to qualified immunity, we "focus on the *officers'* perspectives and perceptions, as it is what reasonable officers *in their position* could have thought that is dispositive of this issue."[15] We rely largely on the statement of facts of the superior court but also independently review the admissible evidence, including the audio recording of the arrest.

■ We review questions of law using the de novo standard, "apply[ing] our independent judgment to questions of law, adopting 'the rule of law most persuasive in light of precedent, reason, and policy.'"[16]

## IV. DISCUSSION

### A. The Law Of Qualified Immunity And Excessive Force In Alaska

■ In Alaska, questions concerning qualified immunity for claims of excessive force are governed both by the Fourth Amendment[17] and by state statute.[18] We consid-

10. *See Sheldon v. City of Ambler*, 178 P.3d 459 (Alaska 2008).

11. Olson's briefing does not address the grant of summary judgment in favor of Oaks but names Oaks as a party to the appeal. At oral argument before our court, Olson's attorney conceded that he was only appealing the separate grant of summary judgment in favor of City of Hooper Bay, Simon, and Joseph.

12. *Beegan v. State, Dep't of Transp. & Pub. Facilities*, 195 P.3d 134, 138 (Alaska 2008) (citing *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n*, 152 P.3d 460, 465 (Alaska 2007)).

13. *McCormick v. Reliance Ins. Co.*, 46 P.3d 1009, 1011 (Alaska 2002) (citing *Mathis v. Sauser*, 942 P.2d 1117, 1120 (Alaska 1997)).

14. *Id.* at 1013. We emphasize that while we construe the facts in Olson's favor, we do so only within the boundaries of reasonable fact-finding. In this case, the entire arrest was recorded by the officers. Where the facts are disputed, we rely upon the audio recording as the most neutral and accurate record of events.

15. *Samaniego v. City of Kodiak*, 2 P.3d 78, 80 (Alaska 2000) (emphasis in the original) (overruled in part by *Sheldon v. City of Ambler*, 178 P.3d 459 (Alaska 2008)).

16. *Jacob v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 177 P.3d 1181, 1184

(Alaska 2008) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

17. In its order granting summary judgment the superior court acknowledged that there is not a consensus among federal circuit courts about whether the Fourth Amendment sets the standard for excessive force after an arrestee is in police custody. The United States Supreme Court has not conclusively decided this issue. *Graham v. Connor*, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Ninth Circuit Court of Appeals, however, has affirmatively held that the Fourth Amendment "continues to apply after an arrestee is in the custody of the arresting officers." *Fontana v. Haskin*, 262 F.3d 871, 879 (9th Cir.2001). Both parties briefed this case under a Fourth Amendment analysis and did not ask us to consider any other standard. We thus assume that the Fourth Amendment offers the relevant standard here.

18. AS 12.25.070 states that a police officer "may not subject a person arrested to greater restraint than is necessary and proper for the arrest and detention of the person." AS 11.81.370(a) allows that a police officer "may use nondeadly force and may threaten to use deadly force when and to the extent the officer reasonably believes it necessary to make an arrest, to terminate an escape or attempted escape from custody, or to make a lawful stop." AS 09.65.070(d)(2) provides immunity from suit for damages for agents, officers, and employees of a municipality if the

ered the question of qualified immunity for a claim of excessive force in *Samaniego v. City of Kodiak*,[19] where we concluded that "[r]egardless of whether the individual officer actually believed that his use of force was reasonable—and regardless of the reasonableness of that belief—the officer is not privileged to use an objectively unreasonable level of force in making an arrest."[20] *Samaniego* relied upon the federal test for qualified immunity first adopted by *Breck v. Ulmer*.[21] But in 2001 the United States Supreme Court created a new federal standard for qualified immunity when it decided *Saucier v. Katz*.[22] *Saucier* held that a ruling on qualified immunity is a question entirely distinct from whether or not excessive force was used in an arrest, and that "a ruling on [qualified immunity] should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."[23] The Court also characterized qualified immunity as "an entitlement not to stand trial or face the other burdens of litigation" and held that "[t]he privilege is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, [the privilege] is effectively lost if a case is erroneously permitted to go to a trial.'"[24]

■ *Saucier* set out a two-part test for determining entitlement to qualified immunity. The "initial inquiry" is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"[25] The second inquiry, necessary only if the first query is answered in the affirmative, is "whether the right was clearly established."[26] In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[27] "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."[28] The Supreme Court also emphasized the order of the excessive force analysis, concluding that the violation of a constitutional right must be established as the threshold question before a court moves on to consider whether it was "clear to a reasonable officer that his conduct was unlawful."[29]

■ Seven years later, in *Sheldon v. City of Ambler*, our court again addressed qualified immunity as a defense to an excessive force claim under Alaska law.[30] We noted in *Sheldon* that we "usually follow[ ] federal case law in the area of qualified immunity" but also that "we are not bound to follow federal law in designing our own judicial

suit is based upon "the exercise or performance or the failure to exercise or perform a discretionary function or duty."

**19.** 2 P.3d 78 (Alaska 2000) (overruled in part by *Sheldon v. City of Ambler*, 178 P.3d 459 (Alaska 2008)).

**20.** *Id.* at 83.

**21.** 745 P.2d 66, 71–72 (Alaska 1987) (noting that Alaska "choose[s] to follow" federal precedent in the area of qualified immunity).

**22.** 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

**23.** *Id.* at 200, 121 S.Ct. 2151.

**24.** *Id.* at 200–01, 121 S.Ct. 2151 (internal citations omitted). This is not to say that a defendant may not be deemed immune at the conclusion of trial. At that stage, however, immunity serves as a "mere defense to liability," *see, e.g.,* *Acevedo–Garcia v. Monroig*, 351 F.3d 547, 562 n. 6 (1st Cir.2003) ("Where defendants continue to assert qualified immunity after undergoing trial ... a post-trial grant of qualified immunity would still confer a benefit by shielding them from any liability for monetary damages awarded by the jury."). The defendant does not enjoy the central privilege afforded by qualified immunity, namely the "entitlement not to stand trial."

**25.** *Id.* at 201, 121 S.Ct. 2151. In excessive force claims, this inquiry equates to consideration of whether the force used comports with the Fourth Amendment's "objective reasonableness standard." *Id.* at 204, 121 S.Ct. 2151.

**26.** *Id.* at 201, 121 S.Ct. 2151.

**27.** *Id.* at 202, 121 S.Ct. 2151 (internal citations and quotation marks omitted).

**28.** *Id.*

**29.** *Id.*

**30.** 178 P.3d 459 (Alaska 2008).

standard for excessive force." [31] *Sheldon* did not entirely overrule *Samaniego,* but it recognized a revised test for qualified immunity in Alaska: *Samaniego* as modified by the two-part analysis of *Saucier.* Under the rule that emerged from *Sheldon,* a police officer in Alaska is entitled to qualified immunity in an excessive force case if the officer's conduct was objectively reasonable or the officer reasonably believed that the conduct was lawful, even if it was not.[32] On the latter prong of the test we stressed that *"merely* subjective beliefs about reasonableness are not enough; the beliefs must also be ones a reasonable officer could have had about the legality of his [or her] actions." [33]

 *Sheldon* rejected the idea that AS 11.81.370 and AS 12.25.070 provide sufficient notice to an officer of the legality or illegality of the officer's actions.[34] We stated that courts inquiring into the presence of notice should "look to our own jurisdiction and other jurisdictions to see if there are any cases, laws, or regulations which would suggest that the type of action taken by the officer is considered unlawful." [35] Notice can be imputed from the presence of relevant laws or regulations, as can lack of notice from a dearth of relevant authority.[36] Alternatively, notice can also be assumed if the officer's conduct is "so egregious, so excessive, that he [or she] should have known it was unlawful, that the nature of the act gave sufficient warning that [the actions taken] were excessive means to restrain someone. One should

not let the lack of explicit law in an area be a substitute for the reasonable officer's common sense." [37] *Saucier* established an ordered two-step analysis on questions of excessive force in which consideration of whether a constitutional right was violated necessarily preceded the question of whether or not it would have been clear to a reasonable officer that the conduct at issue was unlawful.[38] But we have never required *Saucier*'s sequential analysis of excessive force in Alaska. In fact, in *Sheldon,* we deferred to the superior court's finding that a genuine issue of material fact persisted as to whether the officer's use of force was excessive, but affirmed its grant of qualified immunity at the summary judgment level on the grounds that the officer could have reasonably believed his use of a "bear hug" to subdue a citizen was lawful.[39]

We have reached no substantive conclusions on when use of a taser is excessive force in the context of an arrest. But multiple federal courts have reached conclusions about taser usage and excessive force, and we refer to those decisions for guidance in our discussion below.

### B. It Was Error To Grant Summary Judgment On The Issue Of Notice.

On appeal, Olson asserts that the superior court (1) erred "in finding that Alaska law in the field of qualified immunity is identical to federal law as codified in *Saucier* and its progeny," (2) "clearly failed" to interpret conflicting factual evidence in his favor, (3)

**31.** *Id.* at 463. *Sheldon* explains, "We are here dealing with the interpretation of Alaska statutes, not federal law, and have no obligation to follow federal case law."

**32.** *Id.* at 463 ("This test recognizes that there may be behavior that is objectively unreasonable but that nonetheless an officer might have reasonably believed *was* reasonable.").

**33.** *Id.* at 465.

**34.** *Id.* at 466. AS 11.81.370 generally limits when a peace officer may use deadly or nondeadly force; AS 12.25.070 generally restricts the use of unnecessary restraint by a police officer during arrest and detention.

**35.** *Id.* at 466.

**36.** *Id.*

**37.** *Id.* at 467.

**38.** *Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

**39.** *Sheldon,* 178 P.3d at 462, 467. *Saucier*'s mandatory order of analysis is also no longer required under federal law. In *Pearson v. Callahan,* the United States Supreme Court observed that *"Saucier*'s two-step protocol disserves the purpose of qualified immunity when it forces the parties to endure additional burdens of suit ... when the suit otherwise could be disposed of more readily," and held that, as in Alaska, "the sequence set forth [in *Saucier*] ... should no longer be regarded as mandatory." 555 U.S. 223, 129 S.Ct. 808, 811, 818, 172 L.Ed.2d 565 (2009) (internal citations and quotation marks omitted).

erred in failing to find that any use of the taser by the officers constituted excessive force, and (4) erred in concluding that the officers were not on notice from existing case law and regulations that their use of force was excessive. We review a grant of summary judgment de novo[40] and "view the facts in the light most favorable to the non-moving party." [41] We rely largely on the undisputed facts identified by the superior court, but because the record includes an audio recording of the actual events, we also rely upon our independent review of the audio recording and the superior court's written record.

### 1. Olson failed to adequately brief his argument about the differences between state and federal law; this argument is waived on appeal.

 In his "issues presented for review" Olson unambiguously raises the argument that Alaska law on qualified immunity differs from federal law on qualified immunity. And his brief outlines the *Sheldon* test in detail. But Olson's brief does not present any substantive argument to the effect that the superior court conflated state and federal law on qualified immunity. Thus, we consider Olson's first argument waived.[42]

### 2. The superior court did not fail to interpret conflicting evidence in Olson's favor.

 Olson's second argument is that the superior court failed to construe the facts in his favor as required on a motion for summary judgment. Specifically, Olson sets out a series of factual findings he argues the superior court should have reached.[43]

 We agree with Olson that in ruling on a motion for summary judgment, the superior court must "draw all reasonable inferences in favor of" the non-moving party.[44] But this case is unlike many others because an audio recording exists that captured the events. Having reviewed the audio recording and the rest of the superior court's written record, we conclude that the superior court did not fail to construe contested facts in Olson's favor.

We first observe that several of Olson's assertions regarding the superior court's factual conclusions are not supported by the record. For example, Olson argues that the superior court should have determined that he was tased fifteen to eighteen times, all while handcuffed and sitting or lying on the ground. But the court in fact did conclude that "[Olson] was [t]ased fifteen to eighteen times," all while he was either "seated" or "prone on the ground on his stomach," and that "at least some" of the tasings took place while he was in the latter position. Olson also asserts that the superior court erroneously determined that the officers knew of Olson's history with the police. But the court found only that the "officers *stated in*

**40.** *Beegan v. State, Dep't of Transp. & Pub. Facilities*, 195 P.3d 134, 138 (Alaska 2008) (citing *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n*, 152 P.3d 460, 465 (Alaska 2007)).

**41.** *McCormick v. Reliance Ins. Co.*, 46 P.3d 1009, 1011 (Alaska 2002) (citing *Mathis v. Sauser*, 942 P.2d 1117, 1120 (Alaska 1997)).

**42.** *See Petersen v. Mutual Life Ins. Co. of New York*, 803 P.2d 406, 410 (Alaska 1990) ("Where a point is not given more than a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

**43.** Olson asserts that the superior court should have found that: (1) he was tased fifteen to eighteen times, all while handcuffed and sitting or lying on the ground, (2) his "kicks" were in fact unintentional muscular contractions caused by the taser, (3) even if he did kick at the officers, they could have safely moved away from him or

restrained him through a less forceful means, (4) his "kicks at Officer Simon came no where close to causing substantial bodily injury," (5) the officers tased him to gain compliance, not to "control a dangerous person," (6) he was tased "at least twice" while handcuffed and lying on his stomach, (7) the officers tased him when they were "not in danger of suffering any bodily harm," and that (8) the officers in fact did not have knowledge of his "aggressive past history with police." Argument (5) addresses the court's legal conclusion rather than a finding of fact, and will be addressed in section B.3 of this opinion, below. Argument (4) is irrelevant: no part of federal or state law on the use of force requires that an officer come close to or sustain substantial bodily injury before using non-deadly force on an arrestee.

**44.** *Valdez Fisheries Dev. Ass'n, Inc. v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 664 (Alaska 2002).

*their deposition testimony* that they knew the plaintiff's aggressive past history with police," (emphasis added) not that they unequivocally knew of such a history. The court cited to passages in the officers' sworn depositions in which such statements are indeed made.

Olson's remaining arguments are, essentially, variations on a challenge to the superior court's findings that he: (1) "actively resisted arrest"; (2) "refused to comply with numerous verbal commands and remained belligerent throughout the initial encounter, before any force was applied"; and (3) "kicked at and attempted to bite the officers while on the floor, prior to the [t]aser deployment." The superior court cited to admissible testimony and portions of the audio recording that clearly support all of these findings. Even construing all reasonable facts in Olson's favor, the record does not support his assertion that he only began moving his legs in a kicking motion after being tased; the audio recording reflects one of the officers telling Olson to stop kicking before he was tased. It is also uncontested that he attempted to bite the officers before they deployed their tasers. We conclude that the superior court did not fail to construe contested facts in Olson's favor when it ruled on the subject summary judgment motion.

### 3. The superior court correctly concluded that some taser use was permissible in this case.

■ Olson's third argument is that any use of the tasers was excessive force because "the officers used their tasers to gain compliance from a restrained, seated, and later prone arrestee, and not to neutralize a threat to their safety." Olson specifically argues that: (1) his actions did not amount to resisting arrest, or that if they did, his resistance was not dangerous to the officers; and (2)

the officers tased him to gain compliance or to punish him, and that the use of a taser, even a single time, on a subject solely to gain compliance or for a punitive purpose constitutes excessive force. Olson contends that the officers wrongfully "interpret[ed] his confusion as non-compliance inviting an electric shock," that his perceived kicking was an involuntary reaction to the taser, that because of his position and restraints he was not a threat to the officers, and that the officers tased him because they were frustrated and wanted to force him to comply with their orders, not because they were concerned for their safety.

The superior court concluded that the initial deployments of the taser, during Phase Two, were objectively reasonable because the officers "were faced with an immediate threat of bodily harm from [Olson] kicking and biting them in a rapidly deteriorating situation in the home." This conclusion comports with federal law on the use of tasers during an arrest.[45] Construing the facts in Olson's favor, we conclude that the superior court did not err when it determined that Olson was resisting arrest and that his behavior represented "an immediate threat of bodily harm" to officers Oaks, Simon, and Joseph, at least through Phase Two.

The audio recording of the arrest provides imperfect insight into the events of the evening, but it makes objectively clear that there was "a rapidly deteriorating situation in the home." The recording supports the consistent testimony of the officers that Olson appeared to attempt to both kick and bite the police before the tasers were deployed. Olson never denied trying to bite the officers during this phase, and at oral argument before the superior court Olson's counsel seemed to acknowledge that Olson may have been resisting by biting and kicking while the officers were on the ground.[46]

**45.** Federal case law stresses that factors including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" may be considered in evaluating taser use, but that the most important issue is whether the subject was an "immediate threat to the safety of the officers or others." *Bryan v.*

*MacPherson,* 630 F.3d 805, 826 (9th Cir.2010) (internal citations and quotation marks omitted).

**46.** Olson's counsel stated: "In the first few moments [of escorting Olson out of the house], the officers are down. Officer Joseph says that maybe there was some kicking, maybe there was an attempt at biting."

An objectively reasonable officer could have construed Olson's actions as violent physical resistance to their attempts to arrest him. In fact, Olson's counsel conceded at oral argument on the motion for summary judgment before the trial court that "[p]erhaps the first few [taser deployments], under *Sheldon,* arguably, may have been permitted."

It is admittedly troubling that Olson was handcuffed and seated at the time the police allege he was a threat to their safety. However, as courts in other jurisdictions have concluded, Olson's position—even handcuffed and sitting on the floor—did not necessarily mean he was not a threat.[47] Olson was actively struggling with the officers in Phase Two in a deteriorating situation. The superior court's conclusion that he presented a danger to the arresting officers and that the use of the taser was objectively reasonable is supported by the uncontested facts.

Olson also argues that the police officers' conduct constituted excessive force because the taser deployments were impermissibly motivated. Olson views the facts of his case as analogous to either *Orem v. Rephann,*[48] where the Fourth Circuit Court of Appeals found the use of a taser to constitute excessive force when used for the purpose of punishment, or to *Hickey v. Reeder,*[49] where the Eighth Circuit Court of Appeals found a prison guard's use of a taser unlawful because the taser was executed to compel the prisoner to comply with an order to sweep his cell.

In *Orem,* a police officer used his taser multiple times on a woman who was handcuffed, in a foot restraint device, and locked in the back seat of a police car.[50] Orem was alone in the company of three police officers; she weighed 100 pounds, and the officer who tased her weighed 280 pounds.[51] Moreover, relying upon an audio and video recording of the interaction between Orem and the police officer,[52] the court concluded that the officer's *purpose* in deploying the taser was illegitimate. The court concluded that the officer used the taser to "punish or intimidate" Orem, not to protect the officers or Orem herself from harm, stating: "[V]iewed in a light most favorable to Orem, [the facts] evidence that [the officer's] use of the taser gun was wanton, sadistic, and not a good faith effort to restore discipline."[53] The officers who arrested Olson may have been mistaken about the degree of force that was permissible, but the evidence does not support a conclusion that they were motivated by a wanton, sadistic, or punitive purpose. The audio tape convinces us that the facts of this case are not analogous to the facts in *Orem.*

*Hickey v. Reeder* involved a prisoner at the Pulaski County Jail who was awaiting transfer to the state penitentiary.[54] A guard ordered the prisoner to sweep his cell, a part of the daily routine in that jail, but the prisoner refused.[55] Additional guards were then called, one of whom shot Hickey with a stun gun.[56] Hickey recovered from the stun and

---

47. *See, e.g., Zivojinovich v. Barner,* 525 F.3d 1059, 1064–65, 1072–73 (11th Cir.2008) (citing *Draper v. Reynolds,* 369 F.3d 1270, 1278 (11th Cir.2004) *cert. denied,* 543 U.S. 988, 125 S.Ct. 507, 160 L.Ed.2d 373 (2004)) (holding that police use of tasers on a father and son in the process of an arrest was reasonable; the son was tased while seated in a stairwell after struggling with police attempting to handcuff him, and the father was tased twice while he was laying face-down after an officer punched him, and again multiple times while he was handcuffed and being escorted to a police vehicle. The court concluded that both father and son were "repeatedly ignor[ing] police instructions and continu[ing] to act belligerently toward police," that police had probable cause to arrest both father and son for resisting arrest, and that this level of resistance merited the use of a taser by the police officers.).

48. 523 F.3d 442 (4th Cir.2008).

49. 12 F.3d 754 (8th Cir.1993).

50. 523 F.3d at 444.

51. *Id.* at 445.

52. *Id.* at 444–45 (noting that the officer told Orem to "stop it" when she swore at him, and then told her "you need to respect us.").

53. *Id.* at 449.

54. 12 F.3d 754, 756 (8th Cir.1993).

55. *Id.*

56. *Id.*

swept his cell,[57] but he pursued a claim arising from the incident. The Eighth Circuit held that "the use of a stun gun to enforce the order to sweep [the floor] was both an exaggerated response to Hickey's misconduct and a summary corporal punishment that violated Hickey's Eighth Amendment right to be free of cruel and unusual punishment."[58] The court relied upon the officers' testimony to conclude that they did not use the stun gun out of a concern for safety but, rather, as a consequence for Hickey's refusal to sweep his cell.[59]

Here, the officers tased Olson when he failed to comply with their orders, but the orders they gave were to "stop trying to kick, stop trying to bite and comply [with arrest]." In other words, the officers directed Olson to (1) stop trying to harm them, and (2) stop resisting arrest. This is a fundamentally different situation than that of a prisoner locked in a cell who non-violently refuses to comply with an order to sweep the floor. The latter does not present a safety concern to any third party, nor does it present the need for an exigent response. We conclude the superior court correctly decided that Hooper Bay's taser use, through Phase Two, was objectively reasonable and not unlawfully punitive.

**4. The superior court correctly considered the tasings in sequence and concluded under *Sheldon* that it was not required to conclusively decide whether the total force used was excessive.**

■ Olson argues that, even if the officers were justified in tasing him, the number of tasings requires that the total force applied be deemed undeniably excessive.

The superior court analyzed the progression of events during Olson's arrest and, relying on *Beaver v. City of Federal Way*, concluded that "the [excessive force] issue becomes less clear with each application of the [t]aser."[60] The court found that there was a genuine issue of material fact regarding whether the Phase Three and Phase Four tasings were objectively reasonable. But rather than denying summary judgment due to unresolved issues of fact, the superior court considered whether the officers could have been reasonably mistaken about their use of force. On appeal, Olson seems to argue that the superior court should have concluded that these tasings were excessive force as a matter of law: "Whether or not the officers' first electric shocks to Mr. Olson were excessive, there simply can be no debate that their repeated tasings of Mr. Olson became excessive." We disagree.

■ Where the question of excessive force turns on the number of times nondeadly force is applied, a trial court should consider each sequential application of force, to the extent the evidence permits such analysis.[61] And where issues of fact prevent a trial court from deciding as a matter of law whether each successive application of force was permissible, the court should still reach the question of qualified immunity. Failure to establish entitlement to qualified immunity in the pre-trial phase of a case defeats a primary purpose of the claim—to avoid trial. But another primary purpose—immunity from damages—remains attainable if the claim of qualified immunity is established at trial.[62]

---

57. *Id.*

58. *Id.* at 759.

59. *Id.* at 758.

60. 507 F.Supp.2d 1137, 1144–45 (W.D.Wash. 2007).

61. *See id.; see also Neal–Lomax v. Las Vegas Metro. Police Dep't*, 574 F.Supp.2d 1170, 1185–88 (D.Nev.2008).

62. Viewed in isolation, two footnotes in *Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 157–60 (Alaska 1987), could cause confusion on this

point. There, we stated that absolute immunity provides the right to be free from suit, while qualified immunity provides the right to be free from damages, not suit. *Compare id.* at 158 n. 17 (describing absolute immunity), *with id.* at 158 n. 19 (describing qualified immunity). To clarify, a successful pre-trial motion establishing the right to qualified immunity operates in the same manner as a successful pre-trial motion establishing the right to absolute immunity—dismissal without trial. When qualified immunity cannot be established as a matter of law because genuine issues of material fact bar summary judgment, qualified immunity may still be established at trial to shield against damages. *See supra* note 24.

In *Sheldon,* we affirmed the superior court's decision to grant qualified immunity to a police officer without first conclusively determining whether excessive force was used.[63] Here, the superior court correctly concluded that whether the officers' use of force became excessive at some point in Phase Three or Phase Four was a genuine issue of material fact, but it did not deny summary judgment on that basis. Instead, the superior court moved on to consider whether the officers reasonably believed that the force they used was permissible, even if they were mistaken and actually used excessive force.[64] This is consistent with the *Saucier* "reasonable but mistaken belief" element we adopted in *Sheldon.* As we stated in *Sheldon,* an officer who reasonably believes that his or her use of force is lawful, and lacks warning that such conduct is in fact unlawful, is protected from suit by qualified immunity.[65]

Having carefully reviewed the superior court's detailed order, we conclude the court correctly considered the tasings in sequence, and correctly concluded that it did not need to decide whether the total force used was excessive before reaching the question of qualified immunity.

**5. The superior court correctly decided that existing case law did not provide the officers with notice that the force used was excessive.**

Olson's fourth argument is that the superior court erred in concluding that the officers did not have notice that their conduct was unlawful. The order granting summary judgment concluded that, as of December 2006, Fourth Amendment case law concerning the use of tasers was not clear enough to provide notice to the officers regarding the legality of their conduct. But Olson argues that the officers should have been "on notice" that their actions were unlawful because of unpublished case law on the use of tasers and published case law on the use of other types of non-deadly force. We agree with the superior court's conclusion that neither of these sources was sufficient, as of December 2006, to provide notice to the officers that their taser use may have been excessive.

**a. Unpublished case law**

 Under *Sheldon,* a court must consider if a reasonable officer, using force which may or may not have been objectively unreasonable, was "on notice" that his behavior was unreasonable.[66] We said in *Sheldon* that to determine whether an officer was reasonably on notice, courts should "look to our own jurisdiction and other jurisdictions to see if there are any cases, laws, or regulations which would suggest that the type of action taken by the officer is considered unlawful." [67] General excessive force statutes are insufficient to provide this notice; cases that deal with the specific actions taken by police officers are persuasive.[68]

Hooper Bay argues that an unpublished summary judgment order issued by the superior court in Kotzebue[69] may have served as notice that the use of a taser on a handcuffed but resisting arrestee was lawful. Olson argues, in turn, that several unreported cases from outside Alaska put the police officers on

---

**63.** *Sheldon v. City of Ambler,* 178 P.3d 459, 467 (Alaska 2008).

**64.** Here, the superior court determined the pertinent facts from affidavits and deposition testimony. It also would have been within the court's discretion to hold a limited hearing, but only to determine whether there were genuine issues of material fact, not to make factual findings. *See, e.g., Thompson v. Mahre,* 110 F.3d 716, 719–20 (9th Cir.1997) (recognizing that a district court may "sparingly and with great care" take oral testimony from the parties on summary judgment but cautioning that such testimony cannot "lead to a finding on a genuinely disputed fact, but only a determination as to which facts are not genuinely disputed.").

**65.** 178 P.3d at 465–66.

**66.** *Id.* at 466.

**67.** *Id.*

**68.** *Id.* (looking specifically to case law where another officer used a "bear hug and take down" in order to determine if such a maneuver was excessive force).

**69.** *Page v. City of Kotzebue,* Case No. 2KB–07–00076 CI (Alaska Super. March 20, 2008).

notice that their conduct was illegal. The superior court "reject[ed] that unpublished orders from the federal district courts in Washington and California would give notice to officers in Hooper Bay Alaska, of the unlawfulness of their conduct" and also rejected the argument that the unpublished superior court order would provide notice that the officers' conduct was legal. Collectively, the court stated that "[n]one of these cases are examples of citable authority that give guidance to practitioners."

▪ Olson argues on appeal that the superior court's refusal to include unpublished materials in its notice analysis "is contrary to persuasive federal precedent" and "makes little sense" if published cases are deemed to constitute notice. Olson cites to numerous unreported cases in which the use of a taser or other police weapon was deemed objectively unreasonable because the subject was not an immediate threat to the police or to others.[70] He cites these cases as support for

the proposition that "unpublished decisions of district courts may inform [a court's] qualified immunity analysis."[71] We decline to adopt this approach and instead hold that unpublished decisions generally do not provide notice regarding appropriate levels of force.[72]

### b. Published excessive force cases

▪ Olson cites to published excessive force cases not involving tasers,[73] relying on *Landis v. Cardoza*, where a Michigan district court held that it is "appropriate to draw a parallel" between tasers and pepper spray because "[b]oth instruments temporarily incapacitate individuals by causing pain and are intended to permit law enforcement officers to take resisting individuals into custody without having to resort to lethal force."[74] But *Landis* was decided in 2007, a year *after* Olson was arrested. Olson also seems to suggest that *Hickey v. Reeder* may have

---

**70.** These include *Vaughn v. City of Lebanon,* No. 99–6670, 18 Fed.Appx. 252 (6th Cir. Aug. 16, 2001) (use of pepper spray on subject who was not a threat was potentially excessive force); *Rios v. City of Fresno,* No. CV–F–05–644 OWW/ SMS, 2006 WL 3300452 (E.D.Cal. Nov. 14, 2006) (denying summary judgment to police officers where taser was used on a petite subject arrested for a minor offense and there was conflicting testimony about resistance); *Beaver v. City of Federal Way,* No. CV05–1938 MJP, 2006 WL 3203729 (W.D.Wash. Nov. 3, 2006) (seven tasings were illegal unless officers could show subject was fleeing or a threat to safety); *Harris v. County of King,* No. C05–1121C, 2006 WL 2711769 (W.D.Wash. Sept. 21, 2006) (use of taser on compliant subject not threatening officer safety was excessive); *Muro v. Simpson,* No. 1:03–CV–6619 OWW SMS, 2006 WL 2536609 (E.D.Cal. Aug. 31, 2006) (denying summary judgment on excessive force to officer who pepper sprayed a subject already immobilized by a previous taser deployment); *LeBlanc v. City of Los Angeles,* No. CV 04–8250 SVW (VBKX), 2006 WL 4752614 (C.D.Cal. August 16, 2006) (jury could find use of taser excessive on a handcuffed, overdosing subject who did not pose a threat to officers); and *Hudson v. City of San Jose,* No. C–05–03015 RS, 2006 WL 1128038 (N.D.Cal. Apr. 27, 2006) (use of taser and baton on subject who was "pretty much incapacitated" was potentially excessive).

**71.** *Sorrels v. McKee,* 290 F.3d 965, 971 (9th Cir. 2002) (citing *Prison Legal News v. Cook,* 238 F.3d 1145, 1152 (9th Cir.2001)).

**72.** We note, but do not decide, that unpublished court of appeals or supreme court decisions from within Alaska might be considered to provide notice if it could be shown that a defendant was actually given the unpublished decision(s). In the Washington and Oregon cases Olson cites, the appellate courts considered notice to arise from unpublished district court decisions for prison officials working *in the same district,* a distinction we find significant; unpublished decisions from other jurisdictions—as well as unpublished Alaska superior court orders—do not establish precedent, *see, e.g., Coffman v. State,* 172 P.3d 804, 811 (Alaska App.2007), and therefore provide limited guidance regarding appropriate behavior. There is no evidence from which the superior court could have found that the officers in this case received the unpublished opinions cited by Olson, nor were those opinions issued by Alaska appellate courts.

**73.** *Smith v. City of Hemet,* 394 F.3d 689, 701–02 (9th Cir.2005); *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 903 (6th Cir.2004); *Greene v. Barber,* 310 F.3d 889, 898 (6th Cir.2002); *Headwaters Forest Def. v. County of Humboldt,* 276 F.3d 1125, 1130 (9th Cir.2002); *LaLonde v. County of Riverside,* 204 F.3d 947, 961 (9th Cir. 2000); *Landis v. Cardoza,* 515 F.Supp.2d 809, 814 (E.D.Mich.2007), *aff'd by Landis v. Baker,* 297 Fed.Appx. 453 (6th Cir.2008); *Schumacher v. Halverson,* 467 F.Supp.2d 939, 952 (D.Minn. 2006).

**74.** 515 F.Supp.2d at 814.

provided notice.[75] As noted above,[76] that case does involve a taser, but the prisoner in *Hickey* was not resisting arrest; he was in jail and was tased for refusing to comply with an order to sweep his cell.[77] The Eighth Circuit's holding on the distinguishable facts of *Hickey* provided no guidance to the officers attempting to arrest Olson.

Ultimately, both Olson and Hooper Bay acknowledge that there was a lack of published case law on the objective reasonableness of taser usage prior to December 26, 2006. We agree with the superior court that jurisprudence on "claims of excessive force involving [t]asers" was either unclear or nonexistent at the time of Olson's arrest.[78]

### 6. It was error to hold that Hooper Bay's policy on taser use was "irrelevant."

■ Olson also argues that both Hooper Bay Police Department regulations (found in the Hooper Bay Police Department General Order) and the guidelines for taser usage published in January of 2005 by the International Association of Chiefs of Police (IACP) provided notice to Simon and Joseph of the unlawfulness of their conduct.[79] The superior court determined that the IACP guidelines did not provide notice because "[Olson] has offered no evidence that this model policy has been adopted by any police agency within Alaska" and that, even if adopted, the policy "limits the use of [a] [t]aser to situations like the case at bar." The superior

court also found the Hooper Bay Police Department General Order "irrelevant" to the notice question in its qualified immunity analysis, reasoning that reliance on internal police policies may have a perverse impact on the types of regulations adopted by police departments. The superior court also observed that *Sheldon* likely did not signal that "internal department regulations of the department being sued should be *the* piece of 'probative evidence that there was some kind of "notice." ' "

We agree that the IACP guidelines did not provide notice to the officers that their use of force may have been excessive, but we disagree with the superior court's conclusion that the Hooper Bay Police Department General Order was irrelevant. The General Order provides:

> The Advanced Taser shall not be used on a restrained or controlled subject unless the actions of the subject present an immediate threat of death or great bodily harm or substantial physical struggle that could result in injury to themselves or any other person including the deploying police officer.

The superior court's concern was that reliance on local police department policies in the notice component of a qualified immunity analysis could, if taken to the extreme, circumvent the authority of the Alaska and United States Constitutions and state statute.[80] We acknowledge the superior court's

---

**75.** 12 F.3d 754 (8th Cir.1993).

**76.** *See supra* notes 54–59 and accompanying text.

**77.** 12 F.3d at 756.

**78.** In 2000, we decided *Samaniego v. City of Kodiak,* 2 P.3d 78 (Alaska 2000). There, appellant alleged that police officers had employed excessive force (including taser use) when they arrested her. But our holding in that case was limited to the need to apply an *objectively* reasonable standard to the officers' conduct to determine whether they had qualified immunity. We held that genuine issues of material fact precluded summary judgment. Accordingly, we reversed and remanded for further analysis by the superior court. The parties do not argue that *Samaniego* provided meaningful guidance regarding the objective reasonableness of taser usage.

**79.** The IACP Guidelines provide:

> The model policy prohibits [taser] use against anyone unless the person demonstrates an overt intention to use violence or force against the officer or others or resists detention and arrest and other alternatives for controlling them are not reasonable or available under the circumstances.

IACP National Model Policy Center, Electronic Control Weapons Concepts and Issues Paper 3 (January 2005).

**80.** The superior court reasoned that:

> police departments may, out of self-interest to avoid suit, elect to adopt regulations that are facially, objectively unreasonable and then argue that officers are entitled to qualified immunity for their reasonable reliance upon them. The converse could also be true—that a police officer who otherwise would be entitled to qualified immunity for reasonable but mistak-

concern, but the facts of this case do not present an extreme scenario. The Hooper Bay Police Department's General Order established a standard that was uncontested—Olson did not dispute that taser usage is appropriate where an arrestee's conduct threatens immediate harm to police officers—and the policy was not shown to be inconsistent with federal guidelines for taser use.[81] We cannot agree with the superior court that concerns about possible misuse of police department policies in other cases prevented consideration of Hooper Bay's internal policies as a potential source of notice in this case.

We held in *Sheldon* that notice can arise from "cases, laws, or regulations."[82] In *Champion v. Outlook Nashville, Inc.*, the Sixth Circuit incorporated police training into its notice analysis where officers had been clearly, unequivocally instructed that the specific actions they later took were unlawful.[83] Here, the General Order established that tasers "shall not be used on a restrained ... subject" except under specified circumstances. The superior court's ruling that Olson's conduct during Phase Two posed a threat to the officers and justified some taser use is supported by the uncontested facts. But whether those circumstances were present in Phases Three and Four (i.e., whether Olson presented an immediate threat of harm or injury to himself or others) is a question of

fact. The superior court acknowledged as much by finding a genuine issue of material fact as to the reasonableness of the officers' conduct during Phases Three and Four—presumably because it could not determine as a matter of law whether Olson was resisting in a potentially dangerous manner.[84] This outstanding question of fact should have barred entry of summary judgment. Accordingly, we remand for consideration of whether the police department's General Order put the officers on notice that they were not permitted to tase Olson after handcuffing him.[85]

## C. It Was Plain Error For The Superior Court Not To Consider Whether The Nature Of The Officers' Actions Provided Notice That The Force Used Was Excessive.

■ Olson's final argument is that the officers were on notice that their use of force was excessive because their "conduct was so egregious that they should have known it was unlawful." In *Sheldon*, we held that even if existing law does not provide notice to officers that their conduct is unlawful, "the nature of the act [can give] sufficient warning" if it is sufficiently egregious and excessive.[86] On appeal, Olson draws our attention to federal excessive force cases that reach the

---

en beliefs as to the lawfulness of his or her conduct would be deprived of that immunity by an internal department regulation that sets higher standards than the Fourth Amendment baseline.

81. *See supra* note 45.

82. *Sheldon v. City of Ambler*, 178 P.3d 459, 466 (Alaska 2008).

83. 380 F.3d 893, 903 (6th Cir.2004).

84. The superior court's order found that "the initial deployment" of tasers in Phase Two was reasonable because "[t]he officers were faced with an immediate threat of bodily harm from the Plaintiff kicking and biting them in a rapidly deteriorating situation;" in other words, the situation initially fell within an exception to the General Order's rule against tasing a restrained subject. But the superior court did not make a similar finding with regard to Phases Three and Four. Instead, it held that "there is a genuine

issue of material fact presented as to the objective reasonableness of the subsequent uses of force." The court also noted (but did not explicitly address) Olson's argument "that there is a genuine issue of material fact on the voluntariness of [Olson's] kicking movements by virtue of the [t]aser's ability to cause involuntary muscle contractions."

85. Neither party argued that the court should consider guidance on the appropriate use of tasers that may be issued by taser manufacturers. We observe, but do not decide, that this type of source may yield more probative guidance regarding the appropriate limits of taser use because the prospect of liability for misuse presumably motivates manufacturers to issue responsible warnings and instructions for the safe use of their products. Because this argument was not presented, we do not reach it here.

86. 178 P.3d at 467.

same conclusion,[87] and argues that "the officers' own common sense and society's common standards of decency should have caused the officers to realize their application of force was excessive." Olson was tased in drive-stun mode fifteen to eighteen times in approximately 50 seconds. Evidence admitted in conjunction with the summary judgment motion suggests that deployment of a taser in drive-stun mode can cause a subject to become immobilized and disoriented. The record does not contain factual recitations addressing whether the taser temporarily interfered with Olson's ability to comply with the officers' orders, or whether the officers permitted enough time to elapse between tasings for Olson to respond and comply.

We acknowledge that Olson did not make the argument expressly addressing the final prong of the *Sheldon* test in opposition to Hooper Bay's motion for summary judgment, and we do not consider arguments raised for the first time on appeal, absent plain error.[88] But *Sheldon* unambiguously explains that the final prong of Alaska's qualified immunity test requires the superior court to consider whether the nature of the officers' actions, alone, provided notice that the force they used became excessive at some point in the sequence of events.[89] The superior court did not address this question, and we conclude the failure to do so was plain error.

We affirm the superior court's conclusion that the officers' actions during Phase One and Phase Two of their interaction with Olson were objectively reasonable. And we agree with the superior court that the situation became less clear with each successive use of the taser. In Phase Three, when Olson was handcuffed and seated on the floor, and in Phase Four, when Olson was handcuffed and on his stomach, the need for force changed. The officers tased Olson at least fifteen to eighteen times; some of these tases occurred after Olson was handcuffed, on his stomach, and under the control of the freely mobile police officers. It is possible that the relatively rapid and continued application of the taser in Phase Three or Phase Four provided intrinsic notice that the force used was excessive, but the superior court's order does not address this final part of the *Sheldon* test. Because we cannot say as a matter of law that the nature of the officers' actions did not put them on notice that their use of force may have been excessive, we reverse the court's grant of summary judgment on the issue of qualified immunity. On remand, the court should address the final prong of the *Sheldon* test.

## V. CONCLUSION

We REVERSE the order granting summary judgment and REMAND for proceedings consistent with this decision.

**87.** *Lee v. Ferraro*, 284 F.3d 1188, 1198–99 (11th Cir.2002) (notice of unlawfulness existed for qualified immunity purposes when an officer slammed an arrestee's head against the trunk of her car after the arrestee was handcuffed); *see also Hope v. Pelzer*, 536 U.S. 730, 745, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (notice of Eighth Amendment violation arose from action itself when prison inmate was handcuffed to a hitching post for seven hours without water or bathroom breaks); *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir.2000) (actions of police officer who either ordered or allowed his dog to attack a non-resisting arrestee provided notice that force was excessive).

**88.** *Pitka v. Interior Regional Hous. Auth.*, 54 P.3d 785, 788 (Alaska 2002); *Hagans, Brown & Gibbs v. First Nat'l Bank of Anchorage*, 783 P.2d 1164, 1166 n. 2 (Alaska 1989); *Wettanen v. Cowper*, 749 P.2d 362, 364 (Alaska 1988); *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985).

**89.** 178 P.3d at 467.