*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BRET F. MANESS, | ) | |
| | ) | Supreme Court No. S-14172 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-03-08513 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JOHN DAILY, ERIC SMITH, | ) | |
| TINAMARIE BUFFINGTON, THAD | ) | No. 6807 – August 16, 2013 |
| HAMILTON, ERIC SPITZER, | ) | |
| CLIFTON PECK, KEVIN EHM, | ) | |
| MUNICIPALITY OF ANCHORAGE, | ) | |
| ANCHORAGE POLICE | ) | |
| DEPARTMENT, ALASKA STATE | ) | |
| TROOPERS, ALASKA COURT | ) | |
| SYSTEM, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, John Suddock, Judge.

Appearances: Bret F. Maness, pro se, Anchorage. Ruth Botstein, Assistant Attorney General, Anchorage, and Michael J. Geraghty, Attorney General, Juneau, for Appellees Hamilton, Spitzer, and the Alaska State Troopers. Robert P. Owens, Assistant Municipal Attorney, and Dennis A. Wheeler, Municipal Attorney, Anchorage, for Appellees Municipality of Anchorage, Daily, Peck, Ehm, and Anchorage Police Department.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

## I.    INTRODUCTION

In the early hours of June 28, 2001, Alaska State Troopers went to Bret Maness's home to take him into custody for psychological evaluation, pursuant to an involuntary commitment order that had been issued by the superior court. When the troopers arrived at his home, Maness threatened to kill the troopers then fled, first in his RV, and later on foot. During the pursuit, Maness was shot by an Anchorage Police Department officer and then arrested.

Maness filed a civil action against many of the participants in the events leading to his shooting and arrest. In 2008 we affirmed the superior court's grant of summary judgment with respect to all of Maness's claims except those based on excessive force.[1] Maness then amended his complaint, adding numerous state tort claims to his excessive force claims. The superior court again granted summary judgment to the defendants, with the exception of the Anchorage police officer who actually shot Maness. Maness's excessive force claim against the police officer who shot him went to trial, where the jury delivered a verdict for the police officer. Maness now appeals the grant of summary judgment with respect to his claims against two of the Alaska State Troopers who attempted to execute the civil commitment order. He also appeals the superior court's award of attorney's fees to the defendants.

---

[1]     *Maness v. Daily*, 184 P.3d 1, 9 (Alaska 2008).

## II. FACTS AND PROCEEDINGS

### A. Facts

On June 27, 2001, Maness's former girlfriend filed a petition for initiation of involuntary commitment for Maness, alleging that Maness was confused, delusional, and paranoid. At the ex parte proceeding for the commitment, the former girlfriend stated that Maness likely had a gun with him. Based on her testimony, Superior Court Judge Eric Smith ordered that Alaska State Troopers take Maness into temporary custody and transport him to the Alaska Psychiatric Institute (API) for psychological evaluation pursuant to AS 47.30.700. The court's order stated in part that there is "probable cause to believe that the respondent is mentally ill and . . . presents a likelihood of causing serious harm to [himself] or others."

The Alaska State Troopers were informed of the basic facts underlying the order, including that Maness was armed and could be dangerous. Troopers first attempted to execute the order at Maness's home in Wasilla during the evening of June 27, but received no response when they knocked on the front door. When the next shift came on duty that night, Shift Sergeant Randel McPherron sent three troopers — Thad Hamilton, Eric Spitzer, and Kevin Yancey —  to Maness's home for a second attempt.

The three troopers arrived at Maness's home in separate vehicles at approximately 1:00 a.m. They parked on a side road, about 100 yards from Maness's home, and took separate paths up Maness's driveway on foot. Trooper Hamilton described this as a "stealth" approach intended to avoid a surprise attack and ensure officer safety.

Maness's property included both a trailer home and an old Winnebago RV. The troopers heard a dog barking inside the RV and could see a male figure through the RV window. Hamilton approached the RV and exchanged words with the man, who

identified himself as Maness. Hamilton saw a rifle in the RV, within Maness's reach. Hamilton tried the doorhandle and window of the RV to "make sure [Maness] wasn't going for any weapon," but both were locked.

The troopers continued to exchange words with Maness. At some point, Spitzer turned on his shirt-pocket cassette tape recorder and recorded the troopers' interactions with Maness. A transcript of the recording shows that Hamilton told Maness that the troopers were concerned about his health and were not going to take Maness to jail. Maness refused to come out of the RV and profanely exclaimed to the troopers that they were going to die. When Hamilton again told Maness they were not going to take him to jail, Maness responded, "No, you won't, but somebody . . . else will and I ain't going back." Maness then repeated his threat that the troopers would die if they did not leave.

The troopers returned to their vehicles, intending to set up a perimeter and lay a spike strip to disable Maness's RV if he tried to flee. Before they set up the strip, they saw Maness's RV leave the property. The troopers followed Maness in their marked police vehicles with their lights and sirens on, with Spitzer in the lead, Yancey second, and Hamilton third. As the troopers chased Maness, loud popping sounds emanated from his RV. Spitzer and Hamilton believed that some of the popping sounds were from the RV backfiring but that others sounded like gunshots and that Maness was firing at them. Spitzer reported on his police radio that Maness was firing at the troopers and that his car had been hit.

Pursued by the troopers, Maness drove southbound on the Glenn Highway toward Anchorage. Additional law enforcement, including members of the trooper's State Emergency Response Team (SERT) and the Anchorage Police Department (APD), were called to assist with the pursuit. The vehicle pursuit ended when Maness's RV hit a spike strip that other troopers had placed on the road. Maness exited the RV and was

confronted by numerous law enforcement officers from several agencies. Maness claims that he held his hands up and heard gunshots. Maness then ran back into the RV, grabbed a rifle, a handgun, and ammunition, and fled into the woods.

An extended manhunt through the woods ensued as law enforcement agents pursued Maness for about five hours. Hamilton and Spitzer assisted in setting up a perimeter to ensure Maness did not escape the area. Discussing the situation, Spitzer said to Hamilton that he could not find a bullet hole in his car, but nevertheless believed that something had hit his car during the chase. Hamilton told Spitzer that he had been close to shooting Maness's tires out and that he should have done so. While listening to police radio reports of Maness's movements through the woods, Spitzer commented to Hamilton that Maness was going to run into the Inlet and then laughed before saying, "I wish he would have." After hearing further radio communications, Spitzer said to Hamilton, "[W]eapon levels up, even if he's . . . running with it." Spitzer testified that by this comment he meant that if the troopers saw Maness running with his weapon pointed toward them, they should be prepared to shoot him.

At about 4:30 a.m., two troopers (not Spitzer and Hamilton) encountered Maness in the woods and ordered him to stop; Maness responded with a profane comment and fled. At about 6:45 a.m., an APD-led canine tracking team consisting of three APD officers, a police dog, and State Trooper Sgt. McPherron found Maness in a small clearing. APD Officer Clinton Peck fired his weapon, hitting and injuring Maness. At the time he was shot, Maness had in his hand a fully loaded rifle. There was a factual dispute concerning whether Maness had pointed his gun at the team before the shooting. Troopers Hamilton and Spitzer were not part of the canine tracking team and were not present when Maness was shot.

After Maness was shot, Spitzer's car was thoroughly inspected; there was no evidence of gunshot damage. Spitzer testified that even though he may have been

mistaken, he was right to make a "shots fired" report based on what he perceived at the time. He stated that the road they were driving on was very bumpy and "apparently [his] vehicle had bottomed out . . . right after the shot was heard," leading him to believe it was hit. Hamilton testified that he continued to trust his initial impressions that Maness was shooting at the troopers, despite the lack of damage to the car.

McPherron testified that the reason the SERT team was called in was "partly" because of Spitzer's report that Maness was shooting at them, but "the other information that [Maness was] potentially armed and [was] . . . refusing to comply with troopers' orders to surrender" also informed the decision to call in SERT. McPherron also stated that regardless of the report of shots fired, it was proper to continue the pursuit of Maness because the troopers had a valid commitment order and Maness was fleeing officers and committing traffic violations.

Maness acknowledged that previous to the night of the incident he had never met Hamilton or Spitzer and that he had no reason to believe they had a pre-existing vendetta against him.

B.     Proceedings

1.     Maness's initial complaint

Maness, acting without legal counsel, filed a civil action against many of the participants in the events leading to his shooting and arrest, including the Alaska State Troopers and individual Troopers Hamilton and Spitzer. The complaint alleged that Spitzer falsely reported to police dispatch that shots were fired at him and that his car was hit. The complaint also alleged that after stopping but before pursuing Maness into the woods, Spitzer and Hamilton inspected Spitzer's vehicle and found no damage yet negligently failed to report that Spitzer's earlier report that shots had been fired was untrue. The complaint also named the Municipality of Anchorage, the Anchorage Police Department, and APD Officer Peck. The complaint alleged that Peck had shot Maness

in the back without warning, essentially stating a claim that excessive force was used to arrest Maness.

The superior court dismissed a number of Maness's claims, including his excessive force claims.[2] Maness appealed. We affirmed the superior court's grant of summary judgment with respect to all of Maness's claims except those based on excessive force and remanded those claims for further proceedings.[3]

### 2. Maness's amended complaint

On remand, Maness amended his complaint, adding constitutional claims under 42 U.S.C. § 1983 as well as a number of common law tort claims, including causes of action against Troopers Hamilton and Spitzer for burglary, trespass, and conspiracy. Superior Court Judge John Suddock granted the State Defendants' motion for summary judgment in an oral ruling. The court focused on Maness's excessive force claims against the troopers, finding that the case was "at its heart an excessive force case." The court found that Maness "does nothing to pierce [the troopers'] mantle as state police servants for a qualified immunity acting in good faith without malice" and that therefore the troopers were entitled to summary judgment on all of Maness's claims. The court adduced several reasons for this conclusion.

First, the court found that the troopers were lawfully present at Maness's home and "did nothing unlawful at the scene." Second, the court rejected Maness's argument, based on Ninth Circuit precedent, that the troopers "provoked a course of action that foreseeably led to bloodshed." The court found that the troopers were "simply . . . coming to serve a mundane warrant . . . . And the unforeseeable,

---

**2**    *See id.* at 4-5. Maness's remaining claims against the State and Municipality were resolved by stipulation. *Id.* at 5. The stipulation reserved Maness's right to appeal the dismissal of his excessive force claims. *Id.*

**3**    *Id.* at 9.

unpredictable response, the violent response, the unreasonable response is all generated by Mr. Maness within [the RV]." The court concluded that nothing the troopers did "can reasonably be construed to be the sort of action which provokes an armed response." Further, the court found that after Maness threatened the troopers and fled, "the only reasonable response of the [troopers was] to stay with him [and] pursue him," in light of the fact that they knew Maness was armed, angry, and possibly mentally unstable. Finally, the court found that the "ultimate shooting happened independently of the troopers. . . . [N]othing they did hours earlier . . . can reasonably be construed to be the sort of action which provokes an armed response."

With respect to the troopers' good faith, the court found that Maness "cites no preexisting grudge or hatred, no reason for particular animus, no desire to get back at [Maness]." The court found that the troopers' report of shots fired was made in "the fog of war" and in any event was ultimately "irrelevant" to the pursuit of Maness because it "adds no useful information to the task at hand for the officers who all on good and sufficient information" knew that Maness was dangerous. Moreover, the court found that even if the troopers were negligent in reporting that shots were fired or in failing to retract the report once they discovered no damage to their vehicles, "there's nothing to suggest in the remotest sense that it was maliciously so or in bad faith . . . . There's absolutely no information to that effect." In short, "there's no evidence that anything happened that pierced the qualified immunity of the state actors."

The court also granted summary judgment to the Municipality, but denied summary judgment to APD Officer Peck, the officer who fired the shots, finding that there was a factual issue concerning the circumstances of the shooting. Maness's claim against Peck proceeded to trial. The jury rendered a defense verdict, finding that it was "more likely true than not that Officer Peck reasonably believed the use of deadly force

was necessary to make an arrest of a person he reasonably believed may otherwise endanger life . . . or inflict serious physical injury, unless arrested without delay."

The State and Municipal defendants moved for attorney's fees pursuant to Alaska Civil Rule 82.  The court applied Rule 82's fee schedule, awarding prevailing-party attorney's fees in the defendants' favor.

Maness appeals the grant of summary judgment to the troopers and the award of attorney's fees against him.

## III.    STANDARD OF REVIEW

We review a grant of summary judgment "de novo, reading the record in the light most favorable to the non-moving party and making all reasonable inferences in its favor."[4]  We "will affirm a grant of summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."[5]  "The applicability of both state and federal immunity are questions of law that are . . . subject to de novo review."[6]  Under the de novo standard of review, we will "apply our independent judgment to questions of law, adopting the rule of law most persuasive in light of precedent, reason, and policy."[7]  "Because this case raises the question of entitlement to qualified immunity, we 'focus on the *officers'* perspectives and perceptions, as it is what reasonable officers *in their position* could have thought that is dispositive of this issue.' "[8]

---

[4]     *Russell ex rel. J.N. v. Virg-In*, 258 P.3d 795, 801 (Alaska 2011).

[5]     *Id.* at 801-02.

[6]     *Id.* at 802 (quoting *Smith v. Stafford*, 189 P.3d 1065, 1070 (Alaska 2008)).

[7]     *Id.*

[8]     *Olson v. City of Hooper Bay*, 251 P.3d 1024, 1030 (Alaska 2011) (quoting
(continued...)

We "exercise our independent judgment in reviewing whether a trial court has applied the appropriate legal standard in making its prevailing party determination."[9] But we "review a superior court's determination of prevailing party status and attorney's fees for abuse of discretion" and "will overturn such determinations only if they are manifestly unreasonable."[10]

## IV. DISCUSSION

### A. The Superior Court Properly Granted Troopers Hamilton And Spitzer Summary Judgment On Maness's Excessive Force Claims.

The use of excessive force is a statutory violation under Alaska law[11] and "may also run afoul of the Fourth Amendment to the United States Constitution and article I, section 14 of the Alaska Constitution, both of which grant citizens a right 'to

---

[8](...continued)
*Samaniego v. City of Kodiak*, 2 P.3d 78, 80 (Alaska 2000)) (emphasis in original).

[9] *State v. Jacob*, 214 P.3d 353, 358 (Alaska 2009) (quoting *Halloran v. State, Div. of Elections*, 115 P.3d 547, 550 (Alaska 2005)) (internal quotation marks omitted).

[10] *Id.* (quoting *Braun v. Denali Borough*, 193 P.3d 719, 726 (Alaska 2008)) (internal quotation marks omitted).

[11] AS 12.25.070 provides that "[a] peace officer or private person may not subject a person arrested to greater restraint than is necessary and proper for the arrest and detention of the person." AS 11.81.370(a) provides in part that a peace officer "may use nondeadly force and may threaten to use deadly force when and to the extent the officer reasonably believes it necessary to make an arrest, to terminate an escape or attempted escape from custody, or to make a lawful stop."

be secure in their persons' and protect against 'unreasonable searches and seizures.' "[12]

We have explained:

> Pursuant to federal law, whether a police officer uses excessive force in making an arrest depends on the gravity of the intrusion (the type and amount of force inflicted) balanced against the government's need for that intrusion (as measured by the severity of the crime, whether the suspect posed an immediate threat to the officer's or the public's safety, and whether the suspect was resisting arrest or attempting to escape). The standard for excessive force in Alaska is nearly identical — the three considerations that frame the excessive force inquiry are the severity of the crime, whether the suspect immediately threatens the safety of the police or others, and whether the suspect is actively resisting or fleeing arrest.[13]

"Police officers, like other public officials, are protected by qualified immunity when they exercise discretionary functions."[14] In 1987, in *Breck v. Ulmer*, we first addressed the question of "what standard should be applied to determine whether qualified immunity exists when a public official is alleged to have violated a statute or

---

[12]     *Russell ex rel. J.N. v. Virg-In*, 258 P.3d 795, 802 (Alaska 2011). Maness's briefing does not clearly differentiate between his excessive force claims under state law and his excessive force claims under federal law (42 U.S.C. § 1983). However, "[l]ike most courts, we do not require litigants to specify that they are suing under § 1983." *Id.* at 800 n.5. *See Fairbanks Corr. Ctr. Inmates v. Williamson*, 600 P.2d 743, 747 (Alaska 1979) (concluding that a complaint stated a cause of action under § 1983 based on "[c]ombining the broad purposes of 42 U.S.C. § 1983 to provide a cause of action upon allegations of facts constituting deprivation under color of state authority of federal constitutional rights with the liberal pleading provisions of Alaska Rule of Civil Procedure 8").

[13]     *Russell*, 258 P.3d at 802 (citations omitted).

[14]     *Id.* at 803 (citing *Samaniego v. City of Kodiak*, 2 P.3d 78, 83 (Alaska 2000)).

-11-                                                                          6807

the Alaska Constitution."[15] We chose "to follow federal precedent for determining whether qualified immunity should be conferred for [official] acts alleged to contravene a statutory or constitutional mandate."[16] Specifically, we adopted a test established by the United States Supreme Court in *Harlow v. Fitzgerald*.[17] Under this standard, qualified immunity shields public officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[18]

Applying this framework to the specific situation of excessive force claims, we have held that "an officer is entitled to qualified immunity if the officer's conduct was an objectively reasonable use of force or the officer reasonably believed that the conduct was lawful."[19] "Under the second part of the inquiry, the reasonableness of an officer's belief that his conduct was lawful depends on whether a reasonable officer would have been 'on notice' that his particular use of force would be unlawful."[20] Courts inquiring into the presence of notice should "look to our own jurisdiction and other jurisdictions to see if there are any cases, laws, or regulations which would suggest that the type of

---

[15] 745 P.2d 66, 71 (Alaska 1987).

[16] *Id.* at 71-72.

[17] *Id.* (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)).

[18] *Harlow*, 457 U.S. at 818.

[19] *Russell*, 258 P.3d at 803; *see also Olson v. City of Hooper Bay*, 251 P.3d 1024, 1032 (Alaska 2011) (stating that "a police officer in Alaska is entitled to qualified immunity in an excessive force case if the officer's conduct was objectively reasonable or the officer reasonably believed that the conduct was lawful, even if it was not").

[20] *Russell*, 258 P.3d at 803.

action taken by the officer is considered unlawful."[21] "Alternatively, notice can also be assumed if the officer's conduct is 'so egregious, so excessive, that he . . . should have known it was unlawful.' "[22]

We have also observed that our approach to qualified immunity in excessive force cases "comports in all essential respects" with that of the United States Supreme Court.[23] In particular we have clarified that under both Alaska law and federal law "qualified immunity can be conferred when an officer could have reasonably believed that his conduct was lawful (even if it was not)."[24]

Under both Alaska law and federal law, Maness's excessive force claims are unsupported, and the troopers are entitled to qualified immunity. First, as a matter of fact and law there was no excessive force applied to Maness. The only force that was applied to Maness was applied by APD Officer Peck when he shot Maness, and in Maness's lawsuit against Peck, the jury found that Peck's use of force was reasonable. Therefore, all of the alleged torts of the troopers that occurred hours before and miles away, which Maness claims set in motion the ultimate act of his being shot, did not in fact cause (or result in) excessive force.

In his briefing before the superior court, Maness relied in part on a theory of excessive force liability set forth in a line of cases from the Ninth Circuit holding that "where an officer intentionally or recklessly provokes a violent confrontation, if the

---

[21]     *Olson*, 251 P.3d at 1032 (quoting *Sheldon v. City of Ambler*, 178 P.3d 459, 466 (Alaska 2008)).

[22]     *Id.* (quoting *Sheldon*, 178 P.3d at 467).

[23]     *Sheldon*, 178 P.3d at 466; *see also Russell*, 258 P.3d at 802-04 and *Olson*, 251 P.3d at1031-32 (discussing federal and state law with respect to excessive force and qualified immunity).

[24]     *Sheldon*, 178 P.3d at 464.

provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force."[25] Maness argued that Troopers Hamilton and Spitzer were liable for intentionally or recklessly provoking "a verbally violent response from Mr. Maness and escalat[ing] the situation that ultimately resulted in Mr. Maness being shot by law enforcement."

Maness's argument fails because the provocation-of-violence theory he proposes is not "clearly established" in Alaska law. Alaska has never accepted such a theory and, as the Ninth Circuit has acknowledged, the federal circuits have split on the validity of similar provocation-of-violence theories.[26] "Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established."[27] In short, because Maness cannot show pursuant to his theory of liability that the troopers violated any of his clearly established rights, the troopers are protected by qualified immunity from Maness's excessive force claims.

Further, even if the provocation-of-violence theory asserted by Maness were clearly established, his excessive force claims would still fail. The Ninth Circuit has made clear that an officer may be held liable under the provocation-of-violence

---

[25]     *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002) (discussing *Alexander v. City and Cnty. of S.F.*, 29 F.3d 1355 (9th Cir.1994)).

[26]     *Billington*, 292 F.3d at 1186-88 (comparing *Allen v. Muskogee, Okla.*, 119 F.3d 837 (10th Cir. 1997) with *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992), *Gardner v. Buerger*, 82 F.3d 248, 254 (8th Cir. 1996), and *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991)).

[27]     *Feis v. King Cnty. Sheriff's Dep't*, 267 P.3d 1022, 1033 (Wash. App. 2011) (quoting *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011)).

theory only if there is an "independent Fourth Amendment violation."[28] Here, the troopers were acting under a valid court order establishing that "there is probable cause to believe that the respondent . . . presents a likelihood of causing serious harm to [himself] or others" and requiring the troopers to take Maness into custody. Maness's flight prevented the troopers from carrying out the order, but in their attempt to do so the troopers never touched Maness, much less searched or seized him; nor did they search, seize, or enter Maness's RV. In other words, they did nothing to infringe upon Maness's Fourth Amendment rights.

Finally, there is no evidence that the troopers recklessly or intentionally "provoked violence" by their actions. There was a time lag of six hours, including a police chase and an extended manhunt in the woods, between the troopers' conduct at Maness's residence and the shooting. Maness has not cited any authority holding that such an attenuated chain of causation can create excessive force liability.[29] As the superior court found, nothing the troopers did "can reasonably be construed to be the sort of action which provokes an armed response."

In sum, the troopers did not violate any clearly established right of Maness's when they attempted to serve the involuntary commitment order. On the contrary, as the superior court found, the troopers acted in an objectively reasonable fashion throughout the encounter. Accordingly, the superior court correctly ruled that under the doctrine of qualified immunity the troopers were entitled to summary judgment on Maness's excessive force claims.

---

[28] *Billington*, 292 F.3d at 1189.

[29] To the contrary, the Tenth Circuit has held that a provocation-of-violence theory of excessive force can be successful only where the police conduct arguably creating the need for force is "immediately connected" with the Fourth Amendment violation. *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001).

**B.    The Superior Court Properly Granted Troopers Hamilton And Spitzer Summary Judgment On Maness's State Tort Claims.**

Maness's amended complaint asserted a variety of tort claims, including negligence, trespass, defamation, intentional infliction of emotional distress, conspiracy, aiding and abetting attempted murder, and assault and battery.  Maness's briefing before this court does not distinguish among these various claims.  Rather, Maness's briefing focuses on the issue of qualified immunity and argues that Hamilton and Spitzer acted in bad faith, especially with respect to their reports of gunshots by Maness, and that they therefore are not entitled to immunity from Maness's  tort claims.

**1.    Sources of the troopers' qualified immunity**

The troopers are eligible for qualified immunity from Maness's common law tort claims under the three-step analysis set out in *Aspen Exploration Corp. v. Sheffield*[30] and *Alpine Industries, Inc. v. Feyk*.[31]  Alternatively, the troopers are  eligible for qualified immunity under AS 47.30.815(b), which gives peace officers qualified immunity for their actions in execution of mental-health orders.

**a.    Common law qualified immunity**

In *Aspen Exploration Corp. v. Sheffield*, we addressed the scope of immunity to be conferred for official acts alleged to have violated common law rights.[32]  As later summarized in *Alpine Industries, Inc. v. Feyk*, the *Aspen* test for official

---

[30]    739 P.2d 150 (Alaska 1987).

[31]    22 P.3d 445 (Alaska 2001).

[32]    739 P.2d 150 (Alaska 1987).  In *Aspen*, we noted that our opinion "is limited solely to situations where a plaintiff's common law rights are involved.  We express no opinion as to situations where a public official violates clearly established statutory or constitutional rights." *Id.* at 160 n.23.  We first addressed this latter situation in *Breck v. Ulmer*, 745 P.2d 66 (Alaska 1987).  *See supra* Part IV.A.

immunity from a common law tort claim asks three questions: "First, does the doctrine of official immunity apply to the state official's conduct? Second, if it does apply, is the immunity absolute or qualified? And third, if it is only a qualified immunity, did the state official act corruptly, maliciously, or in bad faith?"[33]

In *Prentzel v. State, Department of Public Safety*, we applied the *Aspen* test and held that state troopers were entitled to qualified immunity when a plaintiff brought suit alleging false arrest, false imprisonment, trespass to chattels, conversion, and negligence.[34] With respect to the first question of the *Aspen* test, we observed that "official immunity applies to an official's conduct if (1) it is within the scope of the official's authority, and (2) it is a discretionary act."[35] Applying these criteria to the facts of *Prentzel*, we held that "making arrests and seizing property incident to arrests is conduct that falls within the troopers' usual authority," and that Alaska law provided for such authority.[36] Similarly here, the execution of civil commitment orders falls within the troopers' usual authority as established in AS 47.30.700, which provides that a judge "may direct that a peace officer take the respondent into custody and deliver the respondent to the nearest appropriate facility for emergency examination or treatment."

The second question of the *Aspen* test asks whether the immunity should be absolute or qualified. In *Prentzel*, we concluded that qualified immunity rather than absolute immunity should apply to the troopers' "discretionary act of making arrests and

---

[33]   22 P.3d 445, 447-48 (Alaska 2001) (citations omitted).

[34]   169 P.3d 573, 583, 586 (Alaska 2007).

[35]   *Id.* at 583.

[36]   *Id.* at 584.

seizing contraband in the course of arrest."[37]  Similarly here, qualified rather than absolute immunity applies to the troopers' discretionary act of executing the court order.

The third and final question of the *Aspen* test asks whether the official acted in bad faith.  We discuss this question in section 2 below.

### b.      Qualified immunity under AS 47.30.815(b)

Alaska Statute  47.30.815(b) provides an alternative ground for qualified immunity in this case.  This statute provides that "a peace officer . . . responsible for detaining or transporting a person" under an involuntary civil commitment order "may not be held civilly or criminally liable for detaining a person . . . if the persons have performed their duties in good faith and without gross negligence."[38]  There is no question that the troopers were engaged in an attempt to detain and transport Maness pursuant to an involuntary commitment order.  We shall now turn to the "good faith" and "gross negligence" inquiries.

### 2.      Application of qualified immunity standards

Both *Aspen* and AS 47.30.815(b) require that the troopers have acted in good faith in order to be eligible for qualified immunity.  In addition, AS 47.30.815(b) also requires an absence of gross negligence.   We examine each of these requirements in turn.

---

**37**      *Id*. at 584-85.  We reached this conclusion by weighing three factors identified in *Aspen*:  (1) the nature and importance of the function the officer performed; (2) the likelihood the officer will be subjected to frequent accusations of wrongful motives and how easily the officer can defend against these allegations; and (3) the availability to the injured party of other remedies.

**38**      AS 47.30.815(b).

### a.    Good faith

Maness acknowledges that Troopers Hamilton and Spitzer did not have any malice towards him before they arrived at his home.  However, Maness alleges that Hamilton and Spitzer began to act in bad faith against him after he "scared them into running away" from his home, thereby "injuring their egos."  According to Maness, the troopers then "maliciously and in bad faith conspired to provide false information . . . that [Maness] had shot at them, when they knew this was not true."  Maness offers several arguments in support of this claim.  First, he argues that the physical evidence "undeniably proves" that he did not fire any shots.  Second, he argues that Hamilton and Spitzer "displayed a hostile and dishonest demeanor at deposition . . . and they seemed disappointed and angry that [Maness had] survived to file a lawsuit against them."  Third, Spitzer "made *incredible* allegations over police radio that [Maness] had a gun rigged on [his] motor home to fire backwards while [Maness] was driving."  (Emphasis in original.)  Fourth, "Hamilton and Spitzer's general demeanor at deposition and a cassette recording of the incident show a hostility and desire to retaliate against [Maness] for scaring them into running away from [his] property . . . including an expressed desire to shoot [him] on sight, lamentation for failure to shoot [his] tires out, and a desire that [he] would have run into the inlet."  Fifth, Spitzer "has a long history of retaliatory and vindictive behavior on the job."  Sixth, Hamilton's and Spitzer's testimony "was not believable to anyone objectively assessing their credibility."  Seventh, Maness argues that other law enforcement witnesses were present who "did not report any shots fired."

In *Prentzel*, we observed that "before malice can become a disputed question of fact" sufficient to defeat a motion for summary judgment, "the record must contain at least some objective evidence establishing facts capable of supporting an

inference of malice."[39]  Moreover, "the need for a non-conclusory factual basis is especially important when . . . the ultimate question involves immunity; as we have emphasized on other occasions, official immunity shields government officials 'not just from liability, but from *suit*.' "[40]  We also emphasized that "although the existence or absence of malice is generally a question of fact for the jury, when this question has been removed from the case by uncontroverted affidavits and/or depositions, summary judgment may be granted."[41]  Accordingly, in *Prentzel* we concluded that the plaintiff's "conclusory statements describing his subjective impressions [did] not raise disputed questions of material fact."[42]  In particular, we explained that when the plaintiff's "subjective conclusion that the troopers enjoyed arresting him finds no objective support from the facts in the record," that conclusion "fails to raise a genuine issue of material fact disputing the strong evidence tending to show that the troopers acted without malice."[43]  We also observed that there was "ample record evidence that the troopers acted without malice, and, in fact, did everything they could to ensure that Prentzel's arrest was appropriate."[44]

Maness's affidavit consists largely of the type of conclusory statements and subjective impressions that we found insufficient to create a genuine issue of material

---

[39]  *Prentzel v. State, Dep't of Pub. Safety,* 169 P.3d 573, 585 (Alaska 2007).

[40]  *Id.* (quoting *Karen L. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 953 P.2d 871, 879 (Alaska 1998)) (emphasis in original).

[41]  *Id.* (quoting *Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 160 n.24 (Alaska 1987)).

[42]  *Id.*

[43]  *Id.* at 586.

[44]  *Id.* at 585.

fact in *Prentzel*. Further, Maness provides no "objective evidence establishing facts capable of supporting an inference of malice," as required by *Prentzel*.[45] Although Maness points to some "objective facts" — such as the fact that the troopers' car did not show any evidence of gunshot damage and some stray comments made by the troopers during their stakeout — these facts do not support an inference of malice even if viewed in the light most favorable to Maness. Rather, there is "ample record evidence"[46] that everything the troopers did — from the moment they arrived at Maness's home through the pursuit when Maness fled — was aimed at effectuating the court's lawful order to take Maness into custody and deliver him to API. Accordingly, the superior court properly ruled that Maness "[did] nothing to pierce [the troopers'] mantle as state police servants for a qualified immunity acting in good faith without malice."

### b.    Gross negligence

Finally, the troopers' qualified immunity under AS 47.30.815(b) requires not only good faith but also an absence of gross negligence.[47] We have defined gross negligence as requiring "a major departure from the standard of care."[48] Our holding above that the troopers' conduct was objectively reasonable necessarily compels the conclusion that they acted without gross negligence. Accordingly, the troopers are protected by qualified immunity under AS 47.30.815(b).

---

[45]    *Id.*

[46]    *Id.*

[47]    AS 47.30.815(b) (stating that officers and other specified persons "may not be held civilly or criminally liable for detaining a person under AS 47.30.700-47.30.915 . . . if the persons have performed their duties in good faith and without gross negligence").

[48]    *Storrs v. Lutheran Hosp. & Homes Soc. of Am., Inc.*, 661 P.2d 632, 634 (Alaska 1983).

## C.     Attorney's Fees

The superior court granted the defendants' motions for attorney's fees pursuant to Alaska Civil Rule 82. Maness argues that the superior court's award of attorney's fees was "clearly erroneous" under AS 09.60.010(c)[49] and AS 09.60.010(e).[50] He also argues that under federal law a prevailing defendant may be awarded attorney's fees "only if the plaintiff's underlying claim was frivolous, unreasonable, or groundless."

### 1.     Maness is not a public interest litigant.

As the State correctly observes, AS 09.60.010(c) and (e) do not apply to Maness's claims. Those sections apply "to all civil actions and appeals filed on or after the effective date of this Act," which was September 11, 2003.[51] Maness filed his lawsuit on June 16, 2003, before the act took effect.

---

[49]     AS 09.60.010(c) provides:

> In a civil action or appeal concerning the establishment, protection, or enforcement of a right under the United States Constitution or the Constitution of the State of Alaska, the court . . . may not order a claimant to pay the attorney fees of the opposing party devoted to claims concerning constitutional rights if the claimant . . . did not prevail in asserting the right, the action or appeal asserting the right was not frivolous, and the claimant did not have sufficient economic incentive to bring the action or appeal regardless of the constitutional claims involved.

[50]     AS 09.60.010(e) provides that "[t]he court, in its discretion, may abate . . . an award of attorney fees and costs otherwise payable under (c) and (d) of this section if the court finds . . . that the full imposition of the award would inflict a substantial and undue hardship upon the party ordered to pay the fees and costs."

[51]     Ch. 86, § 4, SLA 2003.

The standard applicable to Maness's claim is set forth in a series of cases beginning with *Gilbert v. State*.[52] *Gilbert* and its progeny established that Rule 82 fees could not be awarded against a losing public interest litigant.[53] Public-interest-litigant status is determined by application of four criteria: (1) whether the litigation sought to effectuate strong public policies; (2) whether numerous people would benefit from the litigation; (3) whether only a private party could have been expected to bring the action; and (4) whether the litigant had sufficient economic incentive to bring the lawsuit.[54]

Maness does not argue that he meets any of these criteria, nor is there reason to believe that he does. In particular, it is clear that Maness's suit will not benefit numerous people. Because Maness is not a public interest litigant, we affirm the superior court's determination that the defendants were prevailing parties entitled to a Rule 82 attorney's fee award with respect to Maness's state law claims.

### 2. Remand is required for reconsideration of § 1983 attorney's fees.

Alaska courts "do not award attorney's fees against section 1983 plaintiffs for that portion of the prevailing party's attorney's fees incurred defending against the section 1983 action, unless the 1983 action was 'frivolous, unreasonable or without foundation.' "[55] Because the superior court did not make a finding whether Maness's § 1983 excessive force claims were "frivolous, unreasonable, or without foundation," we remand for further proceedings on this point. Additionally, because the "record at

---

[52] 526 P.2d 1131, 1136 (Alaska 1974).

[53] *See State v. Native Vill. of Nunapitchuk*, 156 P.3d 389, 394 (Alaska 2007) (discussing *Gilbert*, 526 P.2d at 1136).

[54] *Id.*

[55] *City of N. Pole v. Zabek*, 934 P.2d 1292, 1301 (Alaska 1997) (citing *Lyman v. State*, 824 P.2d 703, 707 (Alaska 1992)).

present does not include enough information to determine which costs and attorney's fees derive from defending the state law claim[s] as distinguished from the federal law claim[]," a "remand on allocation of attorney's fees and costs to the state law claim and the federal law claims . . . is therefore required."[56] On remand, "the [S]tate has the burden of identifying and segregating the state law claim costs," and the superior court "can order the [S]tate's counsel to itemize the hours and nature of the work spent on the case."[57]

## IV. CONCLUSION

We AFFIRM the superior court's order granting summary judgment and all other rulings encompassed in its final judgment except the award of attorney's fees pertaining to Maness's §1983 claim. We VACATE that fee award and REMAND for further proceedings on attorney's fees consistent with this opinion.

---

[56]  *Lyman*, 824 P.2d at 707.

[57]  *Id.*