NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

DAWN BROWN,

     Appellant,

  v.

CITY OF KOTZEBUE and THOMAS SLEASE,

     Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Supreme Court No. S-18360

Superior Court No. 2KB-18-00139 CI

<u>MEMORANDUM OPINION AND JUDGMENT</u>*

No. 1986 – August 16, 2023

Appeal from the Superior Court of the State of Alaska, Second Judicial District, Kotzebue, Paul A. Roetman, Judge.

Appearances: Dawn Brown, pro se, Anchorage, Appellant. Joseph W. Evans, Law Offices of Joseph W. Evans, Bremerton, Washington, for Appellees.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I.   INTRODUCTION

A woman was arrested following a police officer's investigation of an incident involving domestic violence. The woman later sued the officer and the city employing the officer, claiming that the officer acted negligently and used excessive force in arresting her, that the city negligently trained and supervised its officers, and

---

\*   Entered under Alaska Appellate Rule 214.

that she suffered certain injuries as a result. The officer and the city moved for summary judgment, and the superior court granted the motion. The woman appeals, contending that genuine issues of material fact warrant reversal of the superior court's summary judgment order. Because the officer and the city set forth admissible evidence demonstrating entitlement to judgment as a matter of law, and because the woman failed to raise genuine factual issues suggesting otherwise, we affirm the superior court's grant of summary judgment.

## II.   FACTS AND PROCEEDINGS

### A.   Facts

This case arises out of Dawn Brown's arrest by Kotzebue Police Department ("KPD") Officer Thomas Slease. Slease's body camera captured the surrounding events and arrest on video.

On July 9, 2016, Slease was on patrol in Kotzebue. At about 4:15 a.m., bystanders told Slease that a man was trying to kick down a second-floor entry door to a nearby house where a woman inside was screaming. He then drove a short distance to investigate.

After briefly searching the yard, Slease went up to the door, knocked, and announced his presence. He found blood on the stairs and door. Slease looked in the window of the apartment, and continued to knock for several minutes.

When no one responded, Slease went back downstairs into the yard and found Brown's boyfriend hiding in the cab of a camper van. Slease detained him in handcuffs. Brown's boyfriend was verbally uncooperative, but eventually identified Brown, who was then emerging from the apartment, as "Dawn." Slease noted that Brown's boyfriend had blood on his sleeve and face.

As Slease was placing her boyfriend in the patrol car, Brown rushed down the stairs and began to yell at Slease. Brown was antagonistic, called the officer names, and refused to give her name. Slease told her that he had detained her boyfriend and disagreed with her claim that he had done so illegally.

At this point, a neighbor walked toward Slease and Brown. The neighbor was also uncooperative and antagonistic, and Slease had to repeatedly ask him to back away.

Brown then tried to walk back up the stairs while Slease was distracted. Slease told her to "hold up", and he grabbed her arm to prevent her from leaving. Slease maintained a hold on her arm while repeatedly instructing the neighbor to move away, which the neighbor refused to do. Brown yelled at the officer to get his hands off of her. In response, he told her, "You are going to stand over here where I can keep myself safe." She asked, "Keep yourself safe? From what?" Brown continued to scream and struggle with Slease, and the neighbor still refused to back away as instructed. Slease drew his weapon and ordered the neighbor to take his hands out of his pockets; the neighbor then complied and backed away a short distance.

Slease decided to place Brown in handcuffs, and the two struggled briefly while he attempted to handcuff her. He warned Brown that she was "about to go on the ground," and he attempted to have her sit on the ground. In doing this, Slease grabbed the back of Brown's head briefly, but released it to place her in handcuffs. Brown struggled with Slease throughout the exchange, and he repeatedly told her to "stop resisting."

Slease continued to instruct Brown to sit down on the ground, and she responded that he was "doing this for no reason." Slease eventually forced Brown to the ground; she screamed and almost immediately got back up. Meanwhile, the neighbor reapproached and continued to yell at Slease, who eventually handcuffed the neighbor and placed him under arrest. The neighbor was later charged with disorderly conduct, resisting or interfering with an arrest, and assault in the fourth degree on a peace officer.

Slease attempted to interview Brown, noting she was "not under arrest" as she continued to yell at him. He explained to her that he had received a report of a domestic disturbance at her apartment, and that upon his arrival he could hear her

screaming and crying from inside the apartment and found blood outside the apartment. Slease told her that he had been attempting to investigate the situation when she came at him and began yelling at him.

After Brown's repeated denials that anything had occurred, Slease instructed her to sit on a four-wheeler while he continued the investigation. Slease interviewed the neighbors, who reported that they heard a girl screaming inside and saw her boyfriend trying to kick down the door. Slease then interviewed Brown's boyfriend, who stated that she had hit him, which is why he had a bloody nose.

Brown denied hitting her boyfriend. She initially refused to provide any other information about what had occurred that night. But after Slease informed her she was under arrest, Brown asserted that her boyfriend had hit her and she had acted in self-defense, while also continuing to insist that this was none of Slease's business and that he was "not a true cop."

Slease then led Brown over to the patrol car, as she continued to yell and struggle. He placed her in his patrol car without incident. Brown gave no indication at any point that the process of being placed in the car was uncomfortable.

After placing Brown in the patrol car, Slease removed her boyfriend from the car. Slease explained to him that because Slease had reason to believe Brown had hit him, which would constitute a domestic violence assault, Slease was required to arrest her.[1]

Slease then transported Brown to the jail. She did not complain about any pain or injury during the ride to the jail. Once at the jail, Slease interviewed Brown twice: first at around 5:00 a.m., approximately ten minutes after she arrived at the jail,

---

[1]    *See* AS 18.65.530(a)(1) (requiring officers to arrest a person if there is probable cause the person committed a crime of domestic violence). Brown and her boyfriend were dating and had children together, which meant that an assault by one on the other would constitute a crime of domestic violence. AS 18.66.990(3), (5).

and then again about sixteen hours later. During the first interview in the jail, Brown indicated that her boyfriend had been the one to assault her prior to Slease's arrival at their home.

Five days later Brown visited the emergency room complaining of jaw, bicep, and knee pain after "police slammed [a] door in [her] face." The examining nurse noted "superficial" bruising on her chin and knees. The doctor ordered x-rays of her knee and face, and the results were normal. A few weeks later Brown visited Alaska Regional Hospital in Anchorage complaining of a head injury and facial deformity. The examining physician found "no apparent tenderness to palpation" and "[n]o cranial abnormality." The CT scan and the neurological exam were also normal. The doctor diagnosed possible post-concussive syndrome.

For the next two years, Brown sought care for a variety of complaints that centered chiefly around headaches and facial pain. She made repeated visits to Maniilaq Health Center in Kotzebue complaining about headaches and facial deformity. Several visits ended when Brown left abruptly and angrily, protesting that hospital staff did not believe her or take her complaints seriously. After several visits, the nurses and doctors at Maniilaq noted that Brown was an unreliable reporter and expressed doubt that her headaches were real. Providers also suspected that Brown was suffering from several potential psychiatric disorders, including post-traumatic stress disorder. Further CT scans and x-rays conducted in April 2017 and November 2018 and an MRI conducted in June 2017 showed no abnormalities. Brown did not accept that the scans were normal.

B.    Proceedings

Brown filed suit in July 2018, claiming negligence on the part of Slease and negligent training and supervision by the City of Kotzebue. In particular Brown's complaint alleged that Slease physically assaulted her and otherwise acted in a negligent manner. She further alleged that the City of Kotzebue was "aware of the substandard level of understanding in its employees regarding the use of force," and that the City

failed to adequately train and supervise its employees. The City and Slease denied these allegations.

In discovery the City and Slease took Brown's deposition. Brown relayed her version of the events of July 9, 2016. Brown stated it hurt when Slease "pulled [her] hair and pulled [her] on the ground." She further testified that, at some point, she was "hanging halfway[] out [of] the car and [she] told [Slease] that [she] could bring him upstairs and show him what happened, and he said, no, and slammed the door on [her] head." She repeatedly asserted that the video footage from Slease's body camera was "not truthful," claiming that the video footage was time-stamped around 8:00 a.m., and the events that she was describing occurred around 4:00 a.m. Brown also asserted that, in her opinion, no one behaved in a threatening manner toward Slease, no one was combative, and no one physically assaulted Slease.

Slease and the City filed a motion for summary judgment on all claims. They argued that Brown failed to provide evidence that the July 9, 2016 interaction injured her in the way that she claimed. They also argued that Slease was entitled to qualified immunity because any use of force by him on that occasion was objectively reasonable. Finally, they contended that the City was entitled to summary judgment because Brown had not provided any evidence of negligent training and supervision.

In support of their summary judgment motion, Slease and the City submitted an expert report. Based upon the body camera footage and Slease's version of events in his police report, the expert opined that Slease behaved as a "prudent, experienced, and properly trained police officer" would have behaved in the situation, and also concluded that the City properly trained Slease.

In her opposition Brown argued that Slease slammed her head in his patrol car door while arresting her, which she believed constituted negligent conduct and excessive force. In support of that claim, she argued that the video the City initially provided her had become "no longer watchable" and was "not . . . the same." In support of this, Brown provided a USB flash drive to the court with her copies of the videos.

One video on that flash drive is corrupted, but the majority of her copies were identical to the videos provided by the City. In an affidavit Brown continued to assert that the time-stamp on the video was wrong, because the sun was rising in the video and would not have been rising at the time of the events at 4:00 a.m. Brown further claimed that she had photographs from getting out of a friend's car at 4:10 a.m., that Slease subsequently slammed her head in his patrol car door while arresting her, and that Slease then provided her with alcohol and "roofied" her and later staged the arrest captured on the body camera footage. Brown claimed that there were several witnesses, including her boyfriend and the neighbor, who saw the whole encounter as she claims it happened. In support of her motion, Brown submitted photos and CT scans she claimed to show injury.

The superior court held oral argument over two days and granted summary judgment in favor of Slease and the City in February 2022.[2] The court based its ruling primarily on its review of the body camera footage and Brown's medical records. The court found there was no evidence in the record of assault, slamming of a car door on any part of Brown, or injury to Brown's face or head. The court also concluded that Brown had provided no evidence of negligent training or lack of supervision.

Brown appeals.

## III. STANDARD OF REVIEW

---

[2]     Slease and the City asked the court to dismiss the case with prejudice. Brown responded that "[p]rejudice is a long reach, especially when there's an entire medical record proving that [she has] been a victim of prejudice." She reiterates this concern on appeal. We note that for someone without legal training, the phrase "dismissed with prejudice" is likely confusing. It means that someone is not allowed to file another lawsuit based on the same legal claims. *Dismissed With Prejudice*, BLACK'S LAW DICTIONARY (11th ed. 2019). It does not mean that there was any bias or unfairness towards a person during the proceedings.

We review a grant of summary judgment using our independent judgment.[3] We will affirm "if there are no genuine issues of material fact" and if the moving party "is entitled to judgment as a matter of law."[4] "We draw all reasonable inferences in favor of the nonmoving party."[5] Additionally, "we may affirm a grant of summary judgment on grounds other than those advanced by the [superior] court or parties."[6]

Whether a party is entitled to official immunity is a question of law that we review using our independent judgment.[7] When reviewing a claim of qualified immunity, we focus on the officer's perspective, because the controlling standard for deciding the application of qualified immunity is "what [a] reasonable officer[] *in their position* could have thought."[8] "We rely largely on the statement of facts of the superior court but also independently review the admissible evidence," including any recordings of the arrest.[9]

## IV.   DISCUSSION

We affirm the superior court's grant of summary judgment as to Brown's claims against Slease and the City. First, Brown failed to create or demonstrate a genuine issue of material fact suggesting that Slease assaulted her in the way that she

---

**3**     *Blair v. Fed. Ins. Co.*, 433 P.3d 1048, 1051 (Alaska 2018) (citing *Alakayak v. B.C. Packers*, *Ltd.*, 48 P.3d 432, 447 (Alaska 2002)).

**4**     *Id*.

**5**     *Id.*

**6**     *Alakayak*, 48 P.3d at 447.

**7**     *Lum v. Koles*, 426 P.3d 1103, 1109 (Alaska 2018) (citing *Russell ex rel. J.N. v. Virg-In*, 258 P.3d 795, 802 (Alaska 2011)).

**8**     *Olson v. City of Hooper Bay*, 251 P.3d 1024, 1030 (Alaska 2011) (emphasis in original) (quoting *Samaniego v. City of Kodiak*, 2 P.3d 78, 80 (Alaska 2000), *modified by Sheldon v. City of Ambler*, 178 P.3d 459 (Alaska 2008)).

**9**     *Id.*

claims (by slamming her head in his car door). Second, to the extent that there is evidence that could support a different assault or negligence claim, Slease is entitled to qualified immunity. Third, we agree with the superior court that Brown failed to create a genuine issue of material fact that would tend to support or demonstrate negligent training or supervision by the City.

### A. The Superior Court Did Not Err In Granting Summary Judgment As To Brown's Claim That Slease Slammed Her Head In A Door.

In a motion for summary judgment, the moving party (Slease and the City) must first demonstrate both the absence of genuine factual disputes and entitlement to judgment as a matter of law.[10] After the moving party establishes this, the opposing party (Brown) must demonstrate the opposite.[11] To do this, the opposing party must show "that [she] could produce admissible evidence reasonably tending to dispute or contradict" the moving party's evidence.[12] The amount of evidence needed to prevent the entry of summary judgment is low, but "the evidence supporting a claim must not be 'based entirely on "unsupported assumptions and speculation," ' " or "too incredible to be believed by reasonable minds."[13]

Brown's primary claim, which she seems to frame as one of negligence or excessive force, focuses on her allegation that Slease assaulted her in a particular manner: by slamming her head in a door, causing her severe head trauma. On appeal, the essence of her argument is that the superior court failed to consider the evidence

---

[10] *Alakayak*, 48 P.3d at 447-48.

[11] *Id.* at 448.

[12] *Id.* (alteration in original) (quoting *Philbin v. Matanuska-Susitna Borough*, 991 P.2d 1263, 1266 (Alaska 1999)).

[13] *Lum v. Koles*, 426 P.3d 1103, 1109 (Alaska 2018) (quoting *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 (Alaska 2014)).

that she argues supports her version of events.**14** But we observe no error in the court's grant of summary judgment. The admissible evidence in the record, including the officer's body camera footage, demonstrates that the particular use of force that Brown focuses upon did not occur. Indeed, the video footage contains no evidence that Slease used a door in any way that would or could have injured Brown's head, neck, or face. Instead, the video footage shows that Slease placed Brown in his patrol car without incident. Slease then closed the vehicle door normally; Brown's head was at no time close to or between the body of the vehicle and the vehicle door.

Brown does not now dispute that the body camera video footage accurately depicts an interaction between her and Slease during a period of time on the day of her arrest. Instead, she alleges that the video depicts a staged arrest that occurred later in the day. According to Brown the officer first responded to her home at a separate time around 4:00 a.m., arrested her and slammed her head in the car door, placed her "in the drunk tank," and provided her alcohol and drugs so she would not remember the events. Brown claims that Slease then staged another arrest hours later, and that is the arrest depicted in the body camera footage provided by the officer.

In providing this account, Brown appears to focus on the time stamps contained on Slease's body camera footage. The time stamps indicate that the footage is being recorded during the 12:00 p.m. hour. But Slease provided an affidavit in support of his summary judgment motion explaining that the time stamp on the video footage displayed Greenwich Mean Time, which is 8 hours ahead of Alaska Daylight Time. With that explanation, the body camera footage depicts Slease's interaction with and arrest of Brown beginning during the 4:00 a.m. hour, consistent with his account of

---

**14** *See Leahy v. Conant*, 447 P.3d 737, 742 (Alaska 2019) (quoting *Adkins v. Stansel*, 204 P.3d 1031, 1033 (Alaska 2009)) (holding that we consider a self-represented litigant's argument so long as "the essence" of the argument can be easily determined and "the opposing party would not be prejudiced by its consideration.").

the arrest and with Brown's recollection of being arrested at about 4:00 in the morning. The video footage confirming what occurred during Brown's 4:00 a.m. arrest forecloses Brown's claim that she was involved in an entirely separate arrest occurring during that same time period. In the face of the video footage, Brown failed to submit admissible evidence creating any genuine question about whether the officer slammed her head in a car door. Because the uncontradicted evidence shows that this particular alleged use of force did not occur, the City and Slease were entitled to summary judgment as to that allegation.

> **B. To The Extent There Is A Dispute Of Material Fact Regarding Whether Slease Otherwise Injured Brown, The Officer Is Entitled To Qualified Immunity.**

Although Slease's body camera footage demonstrates that the officer did not commit the type of assault that Brown has focused upon (the slamming of her head in a car door), it does suggest that Slease may have caused Brown some amount of physical pain or injury when trying to restrain Brown and force her to the ground. We disagree with the superior court's characterization that the video did not show "even a physical dispute" between Slease and Brown. Rather, the evidence produced by the parties supports a genuine issue of material fact about whether Slease harmed Brown while restraining her. We nevertheless affirm the superior court's grant of summary judgment on other grounds advanced by Slease and the City, namely, that Slease's actions restraining Brown are protected by qualified immunity.[15]

Municipal employees, including police officers, enjoy official immunity for discretionary acts, but not for ministerial acts.[16] Discretionary acts are "those

---

[15]     *Alakayak*, 48 P.3d at 447 ("[W]e may affirm a grant of summary judgment on grounds other than those advanced by the [superior] court or parties.").

[16]     *See* AS 09.65.070(d)(2) (providing immunity from suit for damages for employees of municipality if suit "is based upon the exercise or performance or the

requiring personal deliberation and judgment," whereas ministerial acts are those requiring the officer to merely follow orders or perform a mandatory function.[17] But the immunity "is qualified, not absolute"; it applies only when acts are within the scope of the official's authority, done in good faith, and not malicious or corrupt.[18]

Police officers have the authority to use reasonable force in carrying out their duties,[19] and an officer's use of force in making an arrest will "almost invariably" be considered a discretionary function.[20] Therefore, officers are not liable every time they use force to make an arrest. If a police officer uses force beyond the bounds of the law, however, then the officer can be liable for any harm caused, because an officer only has immunity for acts within the scope of their legal authority.[21]

In order to determine whether a police officer is entitled to qualified immunity for force used in an arrest, we examine whether either "the officer's conduct was objectively reasonable" or "the officer reasonably believed that the conduct was

---

failure to exercise or perform a discretionary function or duty"); *Lane v. City & Borough of Juneau*, 421 P.3d 83, 90 (Alaska 2018) (distinguishing discretionary and ministerial acts and explaining applicability of official immunity only to discretionary acts).

[17] *Lane*, 421 P.3d at 90-91.

[18] *Id.* at 91.

[19] AS 11.81.370(a) (permitting officers to "use nondeadly force . . . when and to the extent the officer reasonably believes it necessary to make an arrest"); AS 12.25.070 (limiting police officer's use of restraints for arrest and detention to no more than what is "necessary and proper"). Police officers' use of force is also limited by protections in the Fourth Amendment to the United States Constitution. *Olson v. City of Hooper Bay*, 251 P.3d 1024, 1030 (Alaska 2011) (citing *Fontana v. Haskin*, 262 F.3d 871, 879 (9th Cir. 2001)).

[20] *Samaniego v. City of Kodiak*, 2 P.3d 78, 83 (Alaska 2000), *modified by Sheldon v. City of Ambler*, 178 P.3d 459 (Alaska 2008).

[21] *See Russell ex rel. J.N. v. Virg-In*, 258 P.3d 795, 802-04 (Alaska 2011).

lawful, even if it was not."[22]   "In other words, a reasonable but mistaken belief can confer immunity on an officer," even if the conduct was unlawful.[23]

Regarding the latter inquiry, the officer's own "subjective beliefs about reasonableness are not enough; the beliefs must also be ones a reasonable officer could have had about the legality of his [or her] actions."[24]   "[T]he reasonableness of an officer's belief that his conduct was lawful depends on whether a reasonable officer would have been 'on notice' that his particular use of force would be unlawful."[25] Statutes, regulations, and court decisions provide notice to officers about whether a particular use of force is lawful.[26] Even where there is not a perfectly applicable law or case precedent, we emphasize that "[o]ne should not let the lack of explicit law in an area be a substitute for the reasonable officer's common sense."[27]   An officer can be assumed to have notice that an act is unlawful if the conduct at issue is "so egregious, so excessive" that any reasonable officer should have known it was unlawful.[28]

Here, we need not decide whether Slease's conduct was "objectively reasonable," because Slease could reasonably have believed his conduct was lawful. That is, as an objective matter, Slease was not "on notice" that the particular use of

---

[22]     *Olson*, 251 P.3d at 1032 (citing *Sheldon*, 178 P.3d at 463).

[23]     *Sheldon*, 178 P.3d at 463-64, *quoted in Maness v. Daily*, 307 P.3d 894, 902 (Alaska 2013).

[24]     *Olson*, 251 P.3d at 1032 (alteration in original) (quoting *Sheldon*, 178 P.3d at 465).

[25]     *Lum v. Koles*, 314 P.3d 546, 553 (Alaska 2013) (quoting *Russell ex rel. J.N.*, 258 P.3d at 803).

[26]     *Olson*, 251 P.3d at 1032.

[27]     *Sheldon*, 178 P.3d at 466-67.

[28]     *Olson*, 251 P.3d at 1032 (quoting *Sheldon*, 178 P.3d at 467).

force demonstrated in this case was excessive.[29] Slease is therefore entitled to qualified immunity.

Looking to our precedent, we have previously determined that officers using certain physical maneuvers in order to protect themselves or others or to gain control over another person were entitled to qualified immunity protection. For example, in *Sheldon v. City of Ambler*, we determined that an officer was entitled to qualified immunity where the officer had tackled a combative domestic violence suspect.[30] The officer had found the suspect assaulting his girlfriend in the street.[31] The suspect refused to respond to any of the officer's orders or commands while holding the handlebars of a four-wheeler his girlfriend was trying to use to leave.[32] After using pepper spray and his police baton, the officer put the suspect in a "bear hug" and shoved him to the ground.[33] We concluded the officer was entitled to qualified immunity based on the lack of Alaska precedent or other guidance indicating that such use of force was unlawful, and based on our conclusion that the officer's conduct was not "shocking" or clearly "excessive."[34] We have further held that the use of less-lethal weapons, such as pepper spray or tasers, is lawful in certain circumstances.[35] Federal precedent also

---

[29] *See Russell ex rel. J.N.*, 258 P.3d at 804.

[30] *Sheldon*, 178 P.3d at 467.

[31] *Id.* at 461.

[32] *Id.* at 461-62.

[33] *Id.* at 462.

[34] *Id.* at 466-67.

[35] *Lum v. Koles*, 314 P.3d 546, 555-56 (Alaska 2013) (holding use of pepper spray reasonable use of force on resisting arrestee); *Olson v. City of Hooper Bay*, 251 P.3d 1024, 1035-36 (Alaska 2011) (use of taser was reasonable on handcuffed arrestee based on threat arrestee posed to officers). *But see Samaniego v. City of Kodiak*, 2 P.3d 78, 85-87 (Alaska 2000), *modified by Sheldon*, 178 P.3d at 465-66 (noting that reasonable jury could find excessive force used when mildly resisting arrestee was tased five times).

suggests that the use of hair pulling — or what the City's expert called "hair control" — is lawful before an arrestee is restrained, so long as it does not result in lasting injury.[36]

Based on this precedent, Slease could have reasonably believed his conduct was lawful. The officer's body camera footage shows that he briefly grabbed Brown's hair to subdue her so that she could be handcuffed and restrained after she had resisted and behaved antagonistically toward Slease. Next, Slease pushed Brown on the ground — *after* she refused to sit down and was continuing to resist. Slease did not use force until after Brown tried to leave the scene and was resisting and did not continue to use force after Brown was in handcuffs and no longer resisting.[37] Slease's use of force is within the bounds of what our precedent and federal precedent have previously held to be lawful.[38] Additionally, there is no evidence in the record to suggest that Slease acted with an improper motive that might preclude qualified immunity.[39] Overall, we hold that Slease was not "on notice" that the particular use of force was excessive, and therefore he could have reasonably believed his use of force was lawful.

---

[36] *See Palmer v. Unified Gov't of Wyandotte Cnty./Kansas City*, 72 F. Supp. 2d 1237, 1247 (D. Kan. 1999) (noting no "authority for the proposition that an officer's pulling on an arrestee's hair rises to the level of a constitutional violation."); *Smith v. Ray*, 781 F.3d 95, 103, n.5 (4th Cir. 2015) (holding officer could not "justify yanking [arrestee] up by her hair once she was handcuffed").

[37] *Cf. Smith*, 781 F.3d at 103 (finding continued use of force after arrestee was handcuffed and compliant unreasonable and unconstitutional).

[38] *See Sheldon*, 178 P.3d at 461-62; *Olson*, 251 P.3d at 1035-36.

[39] *Lum v. Koles*, 426 P.3d 1103, 1110-12 (Alaska 2018) (holding plaintiff provided sufficient evidence of bad faith to survive summary judgment on unlawful entry claim).

We thus affirm the superior court's grant of summary judgment on qualified immunity grounds for Brown's more general claims that Slease used excessive force or negligently caused her injury during the arrest.

### C. The Superior Court Did Not Err In Granting Summary Judgment On The Negligent Training And Supervision Claim.

We also affirm the superior court's grant of summary judgment with respect to Brown's negligent training and supervision claim.

We note first that the City met its initial burden on summary judgment by providing evidence of Slease's conduct, as well as the affidavit of an expert who, upon review of the incident, concluded there was "nothing to suggest" that Slease "was improperly trained or supervised."[40] In order to survive summary judgment on her claim of negligent training or supervision, Brown was required to present evidence which demonstrated that the City either created or failed to correct the alleged system-wide problematic practices at issue.[41] But, as the superior court noted, Brown presented no evidence at all related to any training- or supervision-related practice by the City: no deposition testimony, witness testimony, sworn statements, expert reports, or documents that describe how officers are trained or supervised. In light of our conclusion that Slease is entitled to qualified immunity for his use of physical restraint maneuvers, and the lack of evidence presented by Brown on this claim, the City was entitled to summary judgment in its favor.

## V. CONCLUSION

We AFFIRM the superior court's order granting summary judgment.

---

[40] *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 517 (Alaska 2014).

[41] *Id.*; *Prentzel v. State, Dep't of Pub. Safety*, 169 P.3d 573, 590 (Alaska 2007).